## PEOPLE OF PORTO RICO v. RUSSELL & CO.

(Circuit Court of Appeals, First Circuit.  October 28, 1920.)

No. 1401.

1. **Waters and water courses ☞240—Contract held to suspend former water concessions.**

   A contract between the claimant of water concessions and Porto Rico, whereby the claimant agreed to accept in place of the water under its concessions stated quantities of water from improved works constructed by Porto Rico, together with certain additional water, suspended the concessions while the contract remained in force, so that any right to the water during that time must be based on the contract.

2. **Waters and water courses ☞240—Water contract construed to ascertain intent, whether to be regarded as a grant or a simple contract.**

   A contract whereby the claimant of water concessions agreed to accept in place of the water claimed under its concessions a stated quantity from the irrigation works of Porto Rico, with certain surplus waters, is to be construed to ascertain the intent of the parties, and whether it be a grant or a contract is immaterial to such construction.

3. **Waters and water courses ☞240—Contract held to give plaintiffs all surplus waters covered by existing concessions or contracts thereunder.**

   A contract by the people of Porto Rico, on the authority of Act Aug. 8, 1913 (Acts Sp. Sess. p. 38) § 13, whereby they agreed to give the claimant of certain concessions, as the equivalent of the concessions, a specified quantity of water, and in addition all water of a river available at a pumping station for irrigation of any of its said lands, gave the right to take all the surplus waters available, provided such taking should not deprive owners of subsisting water rights of water to which they were entitled, either by virtue of such water rights or by virtue of any existing or future agreement in regard thereto; this right to continue down to the time the people of Porto Rico shall undertake the utilization of the surplus waters of the river.

4. **Waters and water courses ☞247(1)—Defense that corporation, not party and not entitled to own land, was real owner, held not available.**

   In an action to determine the right to water under a contract, a defense by the people of Porto Rico that the water was in fact owned by a corporation, which was not a party to the action, and which owned land in excess of the amount permitted by Joint Resolution May 1, 1900, was properly stricken.

5. **Appeal and error ☞1050(1)—Admission of evidence as to construction of contract not considered is not prejudicial.**

   Error in admitting evidence as to the proper construction of the contract is not prejudicial, where the Circuit Court of Appeals construed the contract without reference to such evidence and reached the same conclusion as the court below.

   Anderson, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the District of Porto Rico; Hamilton, Judge.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Suit by the Fortuna Estates against Rafaela Castillo Veitia and others, in which Russell & Co. were substituted as plaintiffs, and in which the People of Porto Rico intervened. Decree for the plaintiffs, and the intervener appeals. Decree modified and affirmed.

The affirmative defense set up in the intervener's answer alleged that the rights which plaintiffs claimed belonged in effect to the South Porto Rican Sugar Company, a corporation which owned more than 500 acres of land in the island of Porto Rico, in violation of. Joint Resolution May 1, 1900 (31 Stat. 715).

Charles Marvin, of Washington, D. C. (Dana T. Gallup, of Boston, Mass., and Richard J. Van Deusen, of San Juan, P. R., on the brief), for the People of Porto Rico.

Francis E. Neagle, of New York City (Rounds, Hatch, Dillingham & Debevoise, of New York City, on the brief), for appellees.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

BINGHAM, Circuit Judge. This is the same controversy over water rights in the Jacaguas river in Porto Rico which was before this court, under the name Veitia v. Fortuna Estates, 240 Fed. 256, 153 C. C. A. 182, decided December 29, 1916. The present appellees, hereinafter referred to as plaintiffs, are a partnership and are the successors in title of the original plaintiff, the Fortuna Estates.

Both the Fortuna Estates and the original defendants had entered into contracts with the people of Porto Rico pursuant to its irrigation laws. The Fortuna Estates had the earlier contract, and in the District Court sought and obtained a preliminary injunction against the exercise by the defendants of certain rights claimed under their contract, but asserted by Fortuna Estates to cover water already contracted to it. The defendants appealed to this court, which held that it was then unnecessary to determine the true construction of the Fortuna Estates' contract with Porto Rico; that all questions of interpretation should be left unprejudiced until passed upon by the District Court at a hearing wherein Porto Rico had an opportunity to be heard; and remanded the case with directions to afford Porto Rico an opportunity to intervene. Porto Rico intervened, waiving its immunity as sovereign. Porto Rico v. Rosaly, 227 U. S. 270, 273, 33 Sup. Ct. 352, 57 L. Ed. 507, Russell & Co., having become the successors in title to the Fortuna Estates, were allowed to intervene and file a supplemental complaint, and the original defendants and the people of Porto Rico respectively filed answers thereto, after which the case proceeded to trial.

Under an order of August 24, 1917, pendente lite, the plaintiffs and original defendants, by agreement, divided the water in controversy, each paying one-half the amount claimed by Porto Rico as rent or otherwise, without prejudice and subject to the result of this litigation.

On July 16, 1918, the District Court filed an opinion in favor of the plaintiffs on all issues, entered a decree affirming the validity of all the old water rights or cessions claimed by the plaintiffs, adopted

the plaintiffs' construction of their contract with Porto Rico, enjoined both the original defendants and the intervener from diverting or obstrucing the flow of the water claimed by the plaintiffs, and ordered the money deposited by the plaintiff and defendants, pendente lite, paid over to the plaintiffs. As the original defendants did not desire to appeal from this decree, on motion of Porto Rico the suit was severed, and Porto Rico appealed to this court, specifying 31 assignments of error.

The Jacaguas river rises in a mountainous ridge paralleling the southern coast of Porto Rico and runs some 10 miles southerly into the sea. In the rainy season it carries a considerable volume of water. In dry times it entirely disappears from the surface for 2 or 3 miles; but lower down, in what is known as the Maturi Pool, water reappears in substantial quantities, coming down by filtration through the sandy, porous bed of the stream.

The successful cultivation of sugar cane requires an annual water supply of about 96 inches, delivered as regularly as possible. The rainfall on the south side of the ridge is about one-half that amount. Hence for many years attempts have been made to supplement the rainfall by irrigation from the streams and also from wells. Water rights based on prescription, concessions, and royal decrees of the king of Spain were the actual or alleged appurtenances of most of the estates along the Jacaguas Valley. These concessions and claimed rights exceeded, in the aggregate, the amount of water ordinarily available during parts of the season. Consequently it was necessary to provide for the order in which water takings should be suspended as between the various competing estates. For the efficient and profitable development of sugar raising, a general public irrigation system became necessary. Such a system was provided for by the statute of February 29, 1908, amended by the act of March 9, 1911, and also of August 8, 1913. Acts Sp. Sess. 1913, p. 23. In brief these acts constituted an irrigation commission, provided for irrigation districts, to consist of lands which could be profitably and successfully irrigated, and authorized the construction of dams, reservoirs, canals, etc. These statutes provide various ways for disposing of outstanding actual or claimed water rights; one of which is condemnation, another voluntary relinquishment or agreed compensation in new water rights, and another—the one now pertinent—authorized by section 13 of the act of August 8, 1913, as follows:

"In the case of any land carrying a water right or concession of which the source of supply is destroyed or impaired by the construction or operation of the irrigation system, which shall not have been relinquished or surrendered to the people of Porto Rico, such land shall be entitled to receive from the irrigation system an amount of water which is the reasonable equivalent in value of the said water right or concession.

"The commissioner of the interior is hereby authorized to negotiate with the owner or owners of such water rights or concessions, and with the owner or owners of any water rights or concessions heretofore relinquished or surrendered on condition that the lands to which they are appurtenant should form part of the irrigation district, and which lands have not been included by the irrigation commission, and the said commissioner of the interior shall be empowered to enter into agreements with such owner or owners as to the

amount of water and the time, place and conditions of delivery thereof, which shall be delivered to the lands to which the said water rights or concessions are appurtenant as the fair equivalent in value thereof, with the power on behalf of the irrigation service to enter into agreement with such owner or owners for the relinquishment to the people of Porto Rico of such water rights or concessions, and for the delivery to the lands to which the said water rights or concessions are appurtenant of such fair equivalent. Before entering into any such agreement the commissioner of the interior shall consult the Attorney General of Porto Rico as to the validity and legal status of the water rights or concessions involved."

The power of the government officials to contract with the owners of water rights was, under this section of the statute, limited to giving in exchange for the old water rights water which would be a fair equivalent in value.

The irrigation development of the Jacaguas river involved damming the river by the Guayabal Dam, about six miles from Maturi Pool, and also bringing into its reservoir the waters of the Toro Negro river from the north side of the watershed, where the normal rainfall appears to be about 100 inches a year, double the rainfall on the south side of the watershed. How much Toro Negro water was thus brought into the Guayabal Reservoir this record does not show.

The Guayabal Dam and other irrigation appurtenances were substantially completed in March, 1914. Under date of August 26, 1914, a contract was entered into between the plaintiffs' predecessor in title and Porto Rico, upon the construction of which, under all surrounding circumstances, the rights of the parties depend. The contract is lengthy, consisting of 16 paragraphs, but for present purposes may be much abbreviated. It recites that Fortuna Estates owns 4 tracts, called Fortuna, Cristina, Luciana, and Serrano, which claim to have appurtenant thereto old water rights aggregating 11,032.79 acre feet of water per year, beside an unlimited right to take torrential waters; that Porto Rico has undertaken the construction of a public irrigation system and erected the Guayabal Dam for the purpose of storing the waters of the Jacaguas and Toro Negro, "a stream arising on the north side of the main watershed," by which construction the use of the rights claimed "may be interrupted and impaired." The old rights are stated not to have been relinquished and surrendered; and further, verbatim:

"Whereas, the amount of water taken by the Fortuna Estates and its predecessors in title for the irrigation of said four tracts of land under its said claims of water rights varies from month to month in accordance with the rainfall in the watershed of the said Jacaguas river, so that it is impossible to determine in advance the exact amount of water to which the Fortuna Estates is entitled under the said claimed water rights for any fixed period of time, and the people of Porto Rico (notwithstanding the construction and operation of said Guayabal Dam) is ready to deliver from the said Jacaguas river to the said Fortuna Estates the amount of water to which the latter may be entitled under its said concessions, but, in order to facilitate and make more certain the operation of the said dam and the irrigation system of which it is a part, desires to determine and agree upon an amount of water which, delivered regularly, may, under all attending circumstances, be considered to be the fair equivalent in value for irrigation purposes of the amount of

water which the Fortuna Estates would under ordinary circumstances take and use under the said water rights and concessions; and"

It is then recited that the commissioner has authority, after consulting with the Attorney General, to agree—

"upon an amount of water equivalent to the water taken and used under said water rights and concessions and as to the time, place and conditions of delivery thereof to the lands to which the said water rights or concessions are appurtenant."

The parties, therefore, agree:

"First. The parties hereto hereby agree that the quantities of water specified in this paragraph, delivered uniformly through the year, subject to the terms and conditions specified in this agreement, together with the additional water the right to take which is provided for or reserved in paragraphs third and fourth hereof, are the fair equivalent in value of the water which the said Fortuna Estates takes under and pursuant to the concessions and water rights claimed by it, and the people of Porto Rico will, subject to the conditions and limitations hereinafter specified and at the times, places and subject to the conditions of delivery hereinafter provided for, make delivery to the Fortuna Estates for the irrigation of the said tracts of land hereinabove referred to, of the said amounts of water to wit" (summarizing):

For Fortuna, 3,306.45 acre feet per year, which is about 92 per cent. of the old claim of 3,572.91 acre feet per year.

For Cristina, 1,312.48 acre feet per year, which is about 48 per cent. of the old claim for 2,728.969.

For Luciana, 1,260.22 acre feet per year, which is about 59 per cent. of the old claim for 2,111.42.

For Serrano, 2,379.63 acre feet per year, which is about 90 per cent. of the old claim for 2,619.769.

The reduction in the amounts allowed from an aggregate of 11,032.78 to 8,258.98 (about 75 per cent.) is grounded on the principle of equivalence, and the variation in the percentage to the different estates obviously rests on the order of suspension in times of shortage.

The contract then provides for the details of regular daily deliveries and of points of delivery—not now pertinent, except that Cristina is to receive 571.27 acre feet or .79 second feet per year of the amount above assigned to it at the Aruz pumping station. This water seems to have been regularly received. The Aruz pumping station is in the Maturi Pool, 774 feet below the Maturi intake, where, by a later contract, the original defendants were authorized to take alleged excess water, the subject-matter of this controversy, for the Boca-Chica estate.

The case turns largely upon the interpretation and application of the third paragraph of the contract, the material part of which is as follows:

"Third. Fortuna Estates is hereby granted the right while this agreement remains in force to take in addition to all amounts of water above specified, from the Jacaguas river by pump at the said Aruz pumping station, water which may be available there for irrigation of any of its said lands, to the extent that such taking shall not deprive any owners or users of subsisting water rights or concessions upon the Jacaguas river of the water to which such owners or users may be entitled, either by virtue of such water rights or concessions or by virtue of any agreement or agreements in regard thereto entered into or to be entered into by them with the people of Porto Rico: Provided, however, that should the people of Porto Rico at any time under-

take the development and utilization of the surplus waters of this part of the Jacaguas river, this right shall be understood to be limited to a maximum usage of 3.86 second feet."

The fourth paragraph, referred to in the first paragraph, deals only with torrential waters, not in controversy, and is not now material.

The contract also contains elaborate recitals by the plaintiffs' predecessor in title of the validity of its old water rights and a provision for a yearly brief use of those rights, in order that the same may not be claimed to have lapsed.

As above stated, the Guayabal Dam was completed in March, 1914, and the contract between the plaintiffs' predecessor in title and the people of Porto Rico was entered into on the 26th of August, 1914. On December 14, 1915, the people of Porto Rico entered into a contract with the original defendants, owners of the Boca-Chica estate, "to sell or lease excess water" to them for $6 per day, or, if less than 3 acre feet per day, at the rate of $2 per acre foot, delivered at the Maturi intake. This contract was ratified by the Executive Council on February 15, 1916.

Prior to August, 1915, the people of Porto Rico constructed a dam across the Maturi Pool at the Maturi intake, 774 feet above the Aruz pump, and about the 15th of August, 1915, began to divert the water through the Maturi intake to the Boca-Chica estate, and continued to do so from that time down to the granting of the preliminary injunction May 18, 1916. In the dam thus constructed at the Maturi intake means was provided for letting down to the Aruz pump the .79 second feet, or 571.27 acre feet, per year, which the people of Porto Rico had contracted with the plaintiffs' predecessor to deliver there regularly, so that the diversion complained of by the plaintiffs was not of all the water from the Aruz pump, but only of that which they claim the right to take in excess of .79 second feet. That the defendants diverted by means of the Maturi Dam all the water from Aruz pump in excess of .79 second feet is conceded by counsel for the people of Porto Rico in their brief, and the evidence in the case fully substantiates this concession, for the witness Hanson testified as follows:

"Since that intake was opened, and when the dam was placed in the river, I did not get any water at the Aruz pump over an excess of .79 second feet to which we are entitled, but before the dam was placed there we did receive more water than the .79 second feet that the irrigation service delivered to us regularly. * * * While this dam was in existence we were not obtaining at the Aruz pump any more than the .79 second feet of water which was delivered to us by the daily service. The effect of the construction of that dam was to prevent us from getting any water from the Aruz above the daily amount, and while that dam was in existence water passed through the Maturi Canal going to the hacienda Boca-Chica, owned by the defendants Henna and Cabrera in this case."

He further testified:

"I remember that subsequent to the time when the dam was destroyed an injunction was granted by Judge Hamilton restraining the defendants from taking water at that Maturi Canal, and after that injunction was granted, the old Maturi concession intake was sealed by the marshal of the United

States court, so that water could not pass in the canal. After that injunction was granted and that canal had been sealed up, we again received at the Aruz pump more than the .79 second feet of water to which we are entitled as a regular daily delivery, and, although I don't remember the figures, I think that we got three or four times the amount of water that we were getting, three or four times the .79 second feet. After the Circuit Court of Appeals had reversed the order granting an injunction, the old intake was not re-opened; but they constructed a dam across the river to raise the water high enough to divert it into the Maturi Canal. The canal which they were using as a result of that dam was a canal which had been opened for the purpose of taking torrential waters. This canal was not an ordinary canal. It was at some distance above the ordinary flow of the river. The dam which was built was from 3½ to 4 feet high above the bed of the river, and in order to throw the water into the Maturi torrential intake they raised the water in the Maturi Pool at one time about 4 feet high. The water in the Maturi Pool was about 4 feet deep. While the dam was in operation, and the water running into the Maturi torrential intake, we did not get at the Aruz pump more than .79 second feet daily."

It thus appears that by the construction of the Maturi Dam the defendants took and diverted through the Maturi intake all the water otherwise available at the Aruz pump in excess of the .79 second feet which, under its contract, the people of Porto Rico was required to deliver there regularly, and the questions are: What is the right which the plaintiffs acquired by paragraph third of the contract permitting them to take at Aruz pump in Maturi Pool additional waters to those specifically contracted for in paragraphs 1 and 2? and whether that right has been violated by the diversion which took place at the Maturi Dam.

[1] The plaintiffs take two positions with reference to their claimed right to the surplus water above .79 second feet 'at the Aruz pump in Maturi Pool: First, that they are entitled to this water by virtue of their old Spanish concessions, which they claim are not suspended by the contract of August 26, 1914; and, second, that they are entitled to it as additional water under paragraph third of the contract. But we think it is apparent from a reading of the contract that their old concessions are suspended while the contract remains in force, and that, as it is still in force, their right to the water in question depends upon the contract. There is, therefore, no occasion for considering the concessions or determining their validity. This was the view entertained by this court when the case was here before. In Judge Dodge's opinion, referring to the excess water, he said:

"If the plaintiff had any such prior right, it was superseded while the contract was in force, and could be asserted only to the extent that the terms of the contract permitted the taking of such water." 240 Fed. 261, 153 C. C. A. 182.

The claims of the parties as to the validity, nature, and extent of the old concessions and of prescriptive rights are material only so far as they assist in the interpretation to be put upon the contract. The contract—made under a statute which limited the powers of Porto Rico to contract to grant water rights, described as "the fair equivalent in value" of the old rights or concessions—is the basis upon which the rights of the parties must rest.

Under the contract the Fortuna Estates contracted to take, and Porto Rico contracted to furnish, 8,258.98 acre feet per year, delivered regularly as above set forth, and in addition thereto "water which may be available" at the said Aruz pumping station for the irrigation of any of its said lands under the provisions of paragraph third of the contract, as "the fair equivalent in value" of its old rights thereby suspended.

[2] Much discussion has been indulged in, both in brief and argument, as to whether the contract and particularly paragraph third should be construed as a grant or as a contract; the contention being that, if it was a grant, it should be construed more strictly as respects the grantee than it otherwise would. We do not regard it material whether this provision of the contract be regarded as a grant or as a simple contract, as in either event we are called upon to ascertain, if we can, what the parties intended by the language used, viewed in the light of the circumstances surrounding them at the time the contract was made. The evidence shows that, prior to the construction of the Guayabal Dam, there was excess water at the Maturi Pool during the dry season, or a portion thereof, when the bed of the stream from the Pool to the Ursula intake, some 3 miles above, was dry. It also appears that, after the Guayabal Dam was built, the amount of water in the Maturi Pool at such times was somewhat increased, and that this was probably due to seepage caused by pressure of the water stored behind the dam. It further appears that the plaintiffs' predecessor in title obtained more water at Aruz pump prior to the construction of the Guayabal Dam than it obtained there after its construction and the diversion of the water by the Maturi Dam to the Boca-Chica estate, when it received no surplus water, and that the parties, before and at the time of making the contract, August 26, 1914, knew that the amount of water in Maturi Pool in the dry season was somewhat greater by reason of the storage of water in Guayabal Dam than it had been at a like season of the year prior to the construction of that dam.

[3] In view of the circumstances here narrated as existing at the time the contract was made, we think that the people of Porto Rico, by stipulating in the third paragraph of the contract that Fortuna Estates should have the right to "take in addition to all amounts of water above specified, from the Jacaguas river by pump at the said Aruz pumping station, water which may be available there for irrigation of any of its said lands," intended to give, in addition to the quantities specified in paragraphs first and second, the right to take all the surplus water available at the Aruz pumping station under the physical conditions then existing on this part of the stream for conserving and handling the water, provided such taking should not interfere with water rights or concessions then subsisting on the river or with contracts made or to be made in regard to such subsisting concessions, and that this right should continue down to the time the people of Porto Rico should undertake the development and utilization of the surplus waters of Jacaguas river, when it should be limited to a maximum usage of 3.86 second feet.

It was conceded at the trial and found by the court below that the people of Porto Rico have not undertaken the development and utilization of the waters on this part of the river, so that the latter proviso is now of no consequence.

The additional or surplus waters stipulated for in paragraph third of the contract are not waters that Porto Rico is required to deliver at Maturi Pool in regular daily deliveries, but are waters that are there because of rainfall or seepage and the physical conditions existing on that part of the river. The amount available may be great or little. In dry seasons it is practically certain to be small. But whether great or small, and whether of no particular value when plentiful, and of much value when scarce, it is nevertheless a part of the additional waters stipulated for in the contract going to make up the consideration (the fair equivalent in value) for the old concessions which the contract suspended.

If the people of Porto Rico could maintain a dam near the head of the Maturi Pool, and divert all the water in excess of the .79 second feet which it is required to deliver there regularly, it would be taking away from the plaintiffs the additional or surplus waters which constitute a part of the consideration for the suspension of the plaintiffs' concessions. We think it is not entitled to do this and that, by erecting the Maturi Dam and diverting all the water in excess of .79 second feet, it has invaded the plaintiffs' rights.

[4] We are also of the opinion that the court below was right in directing that the affirmative defense set up in the answer should be stricken out. The South Porto Rico Sugar Company is not a party to the action, so that the issue sought to be raised could not be properly determined; and, if it were a party to the suit, it would then be very doubtful whether the issue could be raised except in a direct proceeding instituted for the purpose.

[5] If at the trial evidence was received relating to the construction of the contract which should not have been, we do not find it necessary to consider the defendants' exceptions to it in detail, for, in the conclusion we have reached, we have not found it necessary to make use of any evidence, the introduction of which could be in any way questioned.

We are also of the opinion that the decree entered in the court below is too broad and should be modified to read:

"It is hereby ordered, adjudged, and decreed as follows:

"1. That the plaintiffs are the owners of four tracts of land situated in the municipal district of Juana Diaz, island of Porto Rico, known as 'Fortuna,' 'Cristina,' 'Luciana' and 'Serrano.'

"2. That by virtue of a certain contract entered into by the plaintiffs' predecessor in title with the acting commissioner of the interior and with the commissioner of the interior of Porto Rico, dated August 26, 1914, and June 8, 1915, set out in the bill, the plaintiffs are entitled to take at Aruz pumping station for the irrigation of their said estates, the surplus water in the Jacaguas river at that point; that is, all the waters in Maturi Pool not necessary for supplying any owners or users of water rights or concessions on the river subsisting August 26, 1914, to which such owners or users may be entitled either by virtue of such water rights or concessions or by virtue of any agreement or agreements in regard thereto entered into or to be entered into by them with the people of Porto Rico.

"3. That by virtue of said contract the plaintiffs are entitled to have the surplus waters in the Jacaguas river as above defined flow down the bed of said river from below the Guayabal Dam to the said Aruz pumping station without diversion or interference by the defendants or the intervener.

"4. That the defendants have obstructed and diverted the flow of the surplus waters of the Jacaguas river to which the plaintiffs are entitled by virtue of the said contract and to their damage.

"5. That a permanent injunction issue directed to the defendants Emilia V. Henna, viuda de Cabrera, Gustavo M. Cabrera y Henna, William Joseph Cabrera y Henna, Mary Cabrera y Henna, Maud Cabrera y Henna, Rafaela Castillo Veitia, viuda de Cabrera, Maria Cabrera, Enrique Cabrera, and Manuel Leon Parra, and to the intervener, the people of Porto Rico, restraining and enjoining each of them, their servants, agents and employés, from diverting or obstructing the surplus waters of Jacaguas river as above defined.

"6. That the plaintiffs are entitled to recover from the intervener, the people of Porto Rico, and the people of Porto Rico is ordered to pay to the plaintiffs, the sum of $441.82 deposited with the clerk of the court by the defendants pursuant to the order of this court dated August 24, 1917, and the sum of $442.01 deposited with the clerk of the court by the plaintiff pursuant to the said order, said sums having been withdrawn by the said intervener, the people of Porto Rico.

"7. That the plaintiffs recover of the defendants their costs in this action, to be taxed by the clerk of the court."

The decree of the District Court of the United States for Porto Rico, modified as above stated, is affirmed, with costs in this court.

ANDERSON, Circuit Judge (dissenting). With the opinion of the majority and its result I regret that I cannot concur. No detailed analysis of the long record and elaborate exposition of my views would be of probable value. I outline merely the main grounds of my dissent.

(1) The opinion of the majority is inconsistent with the opinion of the court, consisting of Judges Dodge, Bingham, and Aldrich, when the case was here before. I agree with the former opinion written by Judge Dodge. In that it was held that the contract between the plaintiffs and Porto Rico is to be construed as a grant of water belonging to Porto Rico, to be interpreted under the usual rule of strict construction against the grantee. Russell v. Sebastian, 233 U. S. 195, 205, 34 Sup. Ct. 517, 58 L. Ed. 912, L. R. A. 1918E, 882, Ann. Cas. 1914C, 1282. The court then said concerning the plaintiffs' rights (240 Fed. 261, 153 C. C. A. 182):

"Its rights under the contract were rights granted directly by said people. It could claim no rights as riparian owner merely. See Trujillo et al. v. Succession of Rodriguez (heretofore decided in this court) 233 Fed. 208, 147 C. C. A. 214. The water which both the plaintiff and those defendants who were operating the 'Boca-Chica' estate were taking, when the bill was filed was then being delivered to them respectively by said people, in pursuance of agreements on its behalf through the proper authorities. To interfere with the agreed deliveries to the defendants was also to interfere with the agreed payment to be made therefor to said people. Interference with the defendants' intake as reconstructed to receive said agreed deliveries was interference with structures which the people had expressly required and authorized the defendants to erect for the purpose of receiving the excess water to be received and paid for as above. The invalidity of the grant made and the authority given by said people to the defendants, asserted by the plaintiff,

could be found by the court to exist only in case it adopted the construction claimed by the plaintiff, but disputed by the defendants, of certain provisions in said people's prior grant to the plaintiff. The construction contended·for materially affected the administration of the irrigation service maintained by said people."

And again (240 Fed. 263, 153 C. C. A. 182):

"Aside from the above question of parties, the court could not justifiably disturb such a situation by injunction at the instance of a party asserting rights under an earlier contract with the same public authorities, unless the earlier contract *clearly appeared* to have covered what they were permitting the defendants to receive under their subsequent grant.

"It cannot be said that the plaintiff's contract of August 26, 1914, *plainly vested* in the plaintiff such rights to excess water as it now claims. The terms of the third paragraph, whereon the plaintiff relies, do not, *in express terms*, grant any right to excess or surplus water. Neither expression is used, and the burden was on the plaintiff to establish the construction for which it contends as the true construction, in view of all the other provisions of the contract and the circumstances therein referred to." (Italics mine.)

But in the majority opinion it is now stated:

"We do not regard it material whether this provision of the contract be regarded as a grant or as a simple contract, as in either event we are called upon to ascertain, if we can, what the parties intended by the language used, viewed in the light of the circumstances surrounding them at the time the contract was made."

Obviously, the latter part of this sentence adds nothing to the first part, which asserts it to be immaterial whether the contract be a grant or not. Intent, of course, always governs both in grants and in simple contracts, *if plainly expressed.* But when, as in this case, the contract is so hazy and ambiguous as to cause the differences disclosed in the majority opinion from the views expressed·when the case was here before, as well as the differences of view in the court as now constituted, it is very material whether the contract is to be regarded as a grant, and subject to the rule of strict construction, or is to be construed as a simple contract.

While it may be technically true that the former decision was limited to deciding that Porto Rico was entitled to be heard, yet, in reaching that conclusion, views were necessarily formed and expressed as to the rights and relations of the parties, including the interpretation of the contract as a grant. The present record is, in no important legal aspect, distinguishable from the former record. Practically, therefore, if not technically, the situation is within the important principle of stare decisis. I think the court should now adhere to the former interpretation of the contract as a grant, and should also apply the sound and well-established rule that public grants are to be strictly construed against the grantee. Long experience and conclusive authority show that only thus are public rights adequately safeguarded.

That the plaintiffs have no case, if the contract is construed as a grant, is, in effect, conceded by the plaintiffs' own able counsel. For, near the close of their lengthy brief, in which they carefully review the evidence and urge every conceivable consideration in favor of

their view, they find themselves driven by the paucity of supporting evidence to take the utterly untenable position that the burden is upon Porto Rico to show the plaintiffs are *not* entitled to have the water in question flow down to the Aruz pump. This is a perhaps unconscious, but practically conclusive, admission that, construing the contract as a grant, they have failed to sustain the burden of showing that it plainly covers the water contracted to be sold to the Boca-Chica estate.

(2) I cannot construe the record as showing, or the lengthy brief of counsel for Porto Rico, when read as a whole, as conceding, that "the defendants diverted by means of the Maturi Dam *all* the water from Aruz pump in excess of .79 second feet." Counsel in their brief quote as uncontradicted evidence the testimony of Giles, chief engineer of the irrigation service, that—

"After the construction of the Maturi Dam some water was allowed to flow down to the Aruz pump through an opening which was provided in the dam when it was constructed, so that the water could flow down. The amount of water that flowed down was not less than one cubic foot per second during the time there was water in that part of the river." (Record, p. 183.)

Obviously, "not less than one cubic foot per second" is substantially more than the .79 second feet; and this was water flowing over the Maturi Dam at the upper end of Maturi Pool. But even if the majority are correct, and not in error as I think, in construing the brief of counsel as conceding the diversion of all the water beyond .79 second feet, this court has no right to deal with substantial public interests on the basis of concessions of counsel, who simply briefed a record already made. It is the record, not the brief, which must determine the action of this court. Concessions of counsel, constituting a part of a record, are on a very different basis; frequently they bind.

But this overflow at the Maturi Dam was not all the water available at the Aruz pump; for the undisputed facts as to the physical situation show conclusively that underground or seepage water gathered in the lower parts of the pool, when the stream was dry for long distances above the pool; i. e., when there was no surface water to flow over the Maturi Dam or for diversion to Boca-Chica. The Maturi Dam was 774 feet above the Aruz pump, and at a grade 2.9 feet higher than the Aruz pump, which was at the lowest point in the pool. Plainly, the Maturi Dam could not cut off the filtration water appearing in this slope of 774 feet below the dam. While it is true that Engineer Giles testified that the irrigation officials did "not with conscious intent" let down through the Guayabal Dam more than enough to supply the .79 second feet required for regular deliveries, yet it is very plain, both from the physical conditions and from the record as a whole, that substantial amounts of water must and did appear at Maturi Pool, derived in large part from the filtration water most abundant at the lowest point (viz. the Aruz pump), and under ordinary conditions increased substantially by excess overflow at the Maturi Dam, over which the irrigation officials allowed enough to flow, when there was water in that part of the river, to

make certain full delivery of the .79 second feet required under the contract. As absolute accuracy would, under the conditions, be impossible, it is plain that substantial quantities of water would be available at the Aruz pump. While such total diversion may have temporarily occurred, as Hanson's evidence, quoted by the majority, indicates, the record as a whole, as I construe it, shows such diversion to be accidental, or only during a period of excessive drought.

Water thus derived from these two sources—filtration and some overflow at the Maturi Dam—was, in my view, the water contemplated as "available at the Aruz pump," in the language used in paragraph 3 of the contract.

Such was the construction put upon the contract by the irrigation officials after more than a year's experience of the changed and changing conditions caused by the operation of the irrigation system. I do not think the plaintiffs have sustained the burden of showing that the officials were wrong, and that the water diverted at the Maturi Dam was not excess water which it was the right and duty of Porto Rico to sell. The record is singularly obscure and inadequate. At most it raises no more than a feeble doubt as to whether the water in question was excess water or water covered by the plaintiffs' contract. It does not even appear how much water was actually delivered to the Boca-Chica estate at the Maturi Dam. It was a question of fact whether the water diverted to Boca-Chica was excess water. The officials familiar with the somewhat complicated conditions determined that it was. I think they were right. At any rate it does not plainly appear that they were wrong.

(3) The majority opinion ignores the fact that the water now held contracted to the plaintiffs must come in substantial part from the Toro Negro river, a source in which not even the plaintiffs' counsel venture to assert that they have rights. Their old concessions were of course limited to water available in the Jacaguas Valley on the south side of the water shed. All the witnesses agree that the water now in controversy accrued in substantial part from pressure of the additional water behind the Guayabal Dam. That pressure was necessarily increased by the water brought from Toro Negro through the new tunnel.

The third paragraph of the decree ordered is:

"That by virtue of said contract the plaintiffs are entitled to have the surplus waters in the Jacaguas river *as above defined* flow down the bed of said river from below the Guayabal Dam to the said Aruz pumping station *without diversion or interference by the defendants or the intervener.*"

This, applied to the facts, amounts to requiring that Porto Rico shall allow some—we know not how much—Toro Negro water to flow down the bed of the Jacaguas river, in order to become available to the plaintiffs at the Aruz pump. We cannot know that thus they may not overrun the full amount of the aggregate of their old concessions. It certainly gives the plaintiffs some water to which they have not a vestige of legal right.

(4) Moreover, the statutory power to contract was limited to "equivalence in value." The result reached plainly gives the plain-

tiffs, not equivalence, but large profits, out of this public irrigation system. Under the decree ordered they are practically certain to get at least the full amount of their old concessions, and delivered with substantial regularity. Now the record shows, and it is obvious, that regularity of delivery is a factor of prime value in any irrigation system. The plaintiffs offered no evidence that, during the diversion complained of, they were not receiving water the full "equivalent in value" of their old concessions. But they did contend that—

"All that the contract of August 26, 1914, was intended to do or did was to change the method and time of the delivery of a small part of the concession waters."

This contention, in effect adopted by the majority, puts a construction upon paragraph 3 of the contract resulting in large profits to the plaintiffs at the expense of Porto Rico or the other water users who must be taxed for all expenses not defrayed by the sale of excess water. Such result I think unconscionable and inconsistent with the fair interpretation of the contract.

(5) The record, though bulky, is singularly meager in relevant and lucid evidence. The fact that both the plaintiffs and Porto Rico agree that, at the time of the contract, it was known that, because of the increased weight of water behind the Guayabal Dam, more water than formerly was appearing at the Aruz pump in the Maturi Pool, does not, I think, support—it controverts—the plaintiffs' contention that the parties intended the contract to cover the entire additional supply, whether it came down in the surface of the river through or over the Maturi Dam, or whether it appeared by seepage in the intervening 774 feet of slope between that dam and the Aruz pump. If the parties had intended the contract to cover all the increased supply, from whatever source, and whether flowing above or below the surface, words apt and unmistakable to effect such intention would have been used, as Judge Dodge pointed out. 240 Fed. 264, 153 C. C. A. 182. That the irrigation officials did not so understand the contract is conclusively shown by their conduct. That the words used, construed as a grant, do not warrant such interpretation, was the view of this court when the case was here before, and is, in my confident judgment, the only fair and sound interpretation of those words.

I think the decree below should be reversed, and the bill dismissed.