### PEOPLE OF PORTO RICO v. HAVEMEYER et al.

### No. 2678.

Circuit Court of Appeals, First Circuit.

June 27, 1932.

William C. Rigby, of Washington, D. C. (Fred W. Llewellyn, of Washington, D. C., Charles E. Winter, Atty. Gen., of Puerto Rico, and Blanton Winship, of Washington, D. C., on the brief), for appellant.

Francis E. Neagle, of New York City (Rounds, Dillingham, Mead & Neagle, of New York City, on the brief), for appellees.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

BINGHAM, Circuit Judge.

This is an appeal from a judgment of the federal District Court in Porto Rico of December 21, 1931, dismissing the suit at law of the plaintiff-appellant on its merits. The action was brought to recover $61,617.04 due as an alleged tax under an Act of the Porto Rican Legislature (No. 49) of July 8, 1921, entitled "An Act fixing a tax on certain lands using water from the Southern Coast Public Irrigation System, on which lands no tax whatsoever was levied under the Public Irrigation Law, and for other purposes." By agreement of the parties the case was tried by the court without a jury upon certain agreed facts and records. A general verdict or finding was made by the court in favor of the defendants, no special findings being made.

The action was brought in the District Court of San Juan. The members composing the defendants' partnership removed the case to the federal District Court on the ground of diversity of citizenship. After the case was removed the plaintiff moved to remand the same. The motion was denied and the defendants answered, setting up a number of special defenses resting on the alleged invalidity of Act No. 49. The plaintiff demurred to the special defenses and the demurrer was overruled. After trial was had and a general verdict or finding in favor of the defendants was made, judgment was

entered for the defendants, and the plaintiff appealed.

The suit was brought June 24, 1930. November 13, 1930, the plaintiff filed an amended complaint, the material differences between the two complaints apparently being that, while the original one named all the persons, except one, constituting the defendants' partnership, it stated that their residences and nationality were not known, while in the amended complaint it stated the names of all the parties constituting the firm and gave their residences and citizenship, showing them all to be citizens and residents of states of the Union, except one who is a citizen of Great Britain residing in Canada.

It appears that the partnership, Russell & Co., Sucesores, S. en C., is composed of Horace Havemeyer, Frank A. Dillingham, Edward S. Paine, Edwin L. Arnold, Frank M. Welty, and H. B. Orde; that they are owners through purchase from Fortuna Estates of four tracts of land known as Haciendas Fortuna, Cristina, Luciana, and Serrano, and sublessees of two other tracts known as Haciendas Union and Placeres (title to the last two tracts being in Jose A. Poventud and others), all of which tracts of land lie along or abut upon the Jacaguas river; that each of these properties has appurtenant thereto rights to take water for irrigation purposes from the Jacaguas river by virtue of certain concessions and royal decrees of the Kingdom of Spain and by user and prescription; that for more than twenty years prior to August 26, 1914, Fortuna Estates, defendants' predecessor in title, and Poventud and others, their immediate lessors, had been taking and using water from the Jacaguas river for irrigation of these lands whenever physically possible up to the aggregate amounts of the concessions; that the water was taken from the bed of the river through intakes built and maintained by the defendants or their predecessors, and also by the Aruz pump at Maturi Pool and by the Union pump; that there were also appurtenant to these properties, by virtue of concessions and royal decrees and by user and prescription, rights to take for irrigation purposes torrential waters which may exist in the Jacaguas river without limit as to quantity, except as limited by the size and location of the torrential intakes established by virtue of the said concessions, royal decrees, user, and prescription; that in accordance with the provisions of the Public Irrigation Law approved September 18, 1908 (Laws of Porto Rico 1908, Special Session, p. 44), as amended in 1911 (Laws of Porto Rico 1911, p. 237), and by the Irrigation Law of 1913 (Laws of Porto Rico, Extraordinary Session 1913, p. 54, No. 128), the people of Porto Rico undertook the construction of a public irrigation system on the south coast of Porto Rico, and, in so doing, erected a dam for impounding and storing the waters of Jacaguas river, known as the Guayabal Dam, which extends across the bed of Jacaguas river, above the intakes which the defendants used for taking water for irrigating the tracts of land above mentioned; that the irrigation law provided that the people of Porto Rico might acquire existing water rights on the Jacaguas river in two ways: (1) By condemnation, in which case the owners would be paid in cash the fair value of their existing rights; and (2) by contracting for the relinquishment of their concessions or water rights by mutual agreement, in which case the owners would be paid not in cash but by receiving credits upon their proportional part of the expense of construction, operation, and maintenance of the system; and that, if neither of these methods was pursued, section 13 of the act of 1913 (p. 72) provided that "such land shall be entitled to receive from the irrigation system an amount of water which is the reasonable equivalent in value of the said water right or concession"; that Fortuna Estates, defendants' predecessor in title to the Haciendas Fortuna, Cristina, Luciana, and Serrano, and J. A. Poventud and others, the owners of Union and Placeres, refused to relinquish their concessions and the rights were not condemned; that, in view of this, the people of Porto Rico, as authorized by the irrigation laws, entered into negotiations with Fortuna Estates and the owners of Union and Placeres for the purpose of fixing, in accordance with section 13 and other provisions of law, the time and place at which the amounts of water, other than torrential water, which they were entitled to take for these six estates should be made available to the owners after the Guayabal Dam was completed and in operation; that, as a result of said negotiations, the people of Porto Rico, on August 26, 1914, entered into two contracts, one with Fortuna Estates and the other with J. A. Poventud and others, which contracts, so far as this controversy is concerned, are of a like nature; that by these contracts the amount of water which is the reasonable equivalent in value of the water rights or concessions pertaining to each tract was determined and that the same should be taken thereafter in regular daily amounts (the amounts agreed upon being substantial-

ly less than the amounts specified in the concessions, to wit, 3,773.81 acre feet less for the four Fortuna Estates tracts and 6,331.76 acre feet less for the two tracts, Union and Placeres); that to make up the fair equivalent additional water might be taken out of surplus waters if there were any; that, so far as Fortuna Estates was concerned, the intakes through which the water was to be furnished under the contract were intakes provided by Fortuna Estates, and, so far as the water was to be pumped from the bed of the river, it was "to be taken by pump at a pumping station heretofore established by the Fortuna Estates * * * known as the Aruz Pumping Station"; that leading from the intakes they had established canals on their properties which took the water to reservoirs, likewise established on their properties, from which they distributed such waters; that the contract as to Union and Placeres contained like provisions as to intakes and pump; that the contracts also provided that torrential waters could be taken from the river but that the government was not to be restrained from holding in the reservoir above the dam such torrential waters as it was legally entitled to restrain; that the contracts set out and specified the number of acre feet per year which each estate was entitled to receive, and it was agreed that "the quantities of water [thus] specified The People of Porto Rico will * * * make delivery * * * for the irrigation of said tracts."

It further appears that while the several estates have been supplied since 1915 with the water agreed upon in accordance with the terms of said contracts of August 26, 1914, neither the defendants nor their said lands have at any time been "supplied with any water for the irrigation of said lands or for other purposes from said Southern Coast Public Irrigation System except such waters as" they and their lands "were and are entitled to receive under and by virtue of the contracts of August 26, 1914"; that, as required by Act No. 49 of 1921, the Treasurer of Porto Rico has assessed against the lands in question a special tax for the fiscal years 1922–23 to 1929–30, inclusive, in amounts aggregating $49,918.56 plus interest amounting to $11,698.48, which sums have not been paid.

In the assignments of error here argued and relied upon the plaintiff complains that the court erred: (1) In failing to remand the case; (2) in holding that Act No. 49 of July 8, 1921, was void (a) as impairing the obligation of the contracts between Porto Rico and the defendants, (b) as taking private property without due process of law, (c) as violating the Organic Act which provides that taxation in Porto Rico shall be uniform, (d) as in conflict with the Treaty of Paris, (e) as violating the equal protection clause of the Organic Act, (f) in that it delegates to administrative officers the legislative function of levying taxes, and (g) in that it makes no provision for hearing or appeal before the taxes become fixed; and (3) that the court erred in rendering judgment for the defendants.

◼ The first question raised by the assignments of error is that of the jurisdiction of the federal District Court. It is conceded that the amount involved is more than $3,000 exclusive of interest and costs. It is also conceded that the parties constituting the partnership of Russell & Co., Sucesores, S. en C., are none of them citizens of or domiciled in Porto Rico, and that the people of Porto Rico, the party plaintiff, is a sovereign political entity created by the Act of Congress of March 2, 1917 (39 Stat. 951), the Organic Act. But inasmuch as the partnership Russell & Co., Sucesores, S. en C., was organized under the laws of Porto Rico and, under those laws, is an independent juridic entity, may sue and be sued in its name, and make contracts, the plaintiff contends that it is to be regarded as domiciled in Porto Rico, the same as if it were a corporation.

This question was first presented to this court by the very parties now before us, in People of Porto Rico v. Fortuna Estates et al., 279 F. 500, 505, in which the statutes affecting the jurisdiction of the federal District Court in Porto Rico and the right of removal thereto from the local island courts are set out. It is therefore unnecessary to repeat them here. In that case we held "that, where the jurisdiction of a federal court over a suit brought against a partnership depends upon diversity of citizenship, the question is to be determined by the citizenship of its members, whether under the law of the place of its origin it is regarded as an entity and may sue or be sued in its partnership name." That case was decided March 8, 1922. The people of Porto Rico applied to the Supreme Court of the United States for a writ of certiorari and the application was denied. 259 U. S. 587, 42 S. Ct. 590, 66 L. Ed. 1077. In support of the conclusion reached in that case we called attention to the following authorities: Chapman v. Barney, 129 U. S. 677, 682, 9 S. Ct. 426, 32 L. Ed. 800; Great Southern Fire

Proof Hotel Co. v. Jones, 177 U. S. 449, 455, 20 S. Ct. 690, 44 L. Ed. 842; McLaughlin Bros. v. Hallowell, 228 U. S. 278, 33 S. Ct. 465, 57 L. Ed. 835; Bruett & Co. v. Austin Drainage Excavator Co. (C. C.) 174 F. 668; Columbia Digger Co. v. Rector (D. C.) 215 F. 618; Empire Rice Mill Co. v. K. & E. Neumond (D. C.) 199 F. 800. In Goico v. Russell & Co. (C. C. A.) 4 F.(2d) 7, 8, the same Russell & Co. were before the court as defendants as are now, and the same question of jurisdiction was again raised and decided. There the suits had been brought in the District Court for the Judicial District of Ponce and removed to the federal District Court and after removal the motion to remand was denied. This case was decided February 18, 1925, about three years after our prior decision. We there said:

"This contention is without merit. The defendant partners are domiciled in the United States and Great Britain. It is immaterial that under the law of Porto Rico the partnership is an entity referred to in the singular number. This court held in Porto Rico v. Fortuna Estates, 279 F. 500 (the same partnership now defendant in this suit), that 'where the jurisdiction of a federal court over a suit brought against a partnership, depends upon diversity of citizenship, the question is to be determined by the citizenship of its members, whether under the law of the place of its origin it is regarded as an entity and may sue or be sued in its partnership name.' Compare, also, Mestre v. Russell & Co. (C. C. A.) 279 F. 44. These decisions are conclusive of the right of the defendant to remove."

In view of the consideration given to this question in our prior decisions, we do not find it necessary to consider the matter further. The motion to remand was properly denied.

In the District Court it was held that Act No. 49 of July 8, 1921, violated that clause of section 2 of the Organic Act of Porto Rico wherein it is provided that "no law impairing the obligation of contracts shall be enacted." 39 Stat. 951 (48 USCA § 737).

As above pointed out, the provisions of the contract of August 26, 1914, between the people of Porto Rico and Fortuna Estates, relating to the rights of the defendants to water for the tracts Fortuna, Cristina, Luciana, and Serrano, are the same as those of the contract for water for the tracts Union and Placeres, and what is to be said in re-

lation to the first-named contract applies with equal force to the latter.

In People of Porto Rico v. Russell & Co., 268 F. 723, this court had before it the authority of the Commissioner of the Interior, acting under the advice of the Attorney General of Porto Rico, under the Act of February 29, 1908 (authorizing the establishment of the irrigation district), as amended by the Acts of March 9, 1911, and August 8, 1913, and particularly section 13 of the latter act, to enter into such contract and, in the course of the opinion (page 726 of 268 F.), we said:

"The power of the government officials to contract with the owners of water rights was, under this section [section 13] of the statute, limited to giving in exchange for the old water rights water which would be a fair equivalent in value."

It is also pointed out that the Guayabal Dam and other irrigation appurtenances had been substantially completed in March, 1914, before the contract of August 26, 1914, was entered into; that the four tracts of land owned by Fortuna Estates had appurtenant thereto old water rights aggregating 11,032.79 acre feet per year, besides an unlimited right to take torrential waters; that, in the construction of the irrigation system, Porto Rico had erected the Guayabal Dam for the purpose of storing the waters of Jacaguas and Toro Negro rivers, thereby interrupting or impairing the plaintiff's old water rights which had not been relinquished or surrendered; and that, whereas the amount of water received by Fortuna Estates for its four tracts of land under its old concessions varied from month to month, depending upon the rainfall in the watershed of the Jacaguas river, and whereas the people of Porto Rico were ready to deliver to said Fortuna Estates the amount of water to which it was entitled under said concessions, nevertheless "in order to facilitate and make more certain [possible] the operation of the said dam and the irrigation system of which it is a part, desires to determine and agree upon an amount of water which, delivered regularly, may, under all attending circumstances, be considered to be the fair equivalent in value for irrigation purposes of the amount of water which the Fortuna Estates would under ordinary circumstances take and use under the said water rights and concessions"; and that, in view of this, the parties therein agreed, for Fortuna, upon 3,306.45 acre feet per year, or 92 per cent. of its old concessions appurtenant thereto, for Cristina, on 1,312.48 acre feet per year

or 48 per cent. of its old concessions, for Luciana, 1,260.22 acre feet per year or 59 per cent. of its old concessions, and for Serrano, 2,379.63 acre feet per year or 90 per cent. of its old concessions; and Porto Rico agreed that it would deliver these amounts of water to the respective estates, together with additional water out of surplus, if there was any surplus; that the same were "the fair equivalent in value of the water which the said Fortuna Estates takes under and pursuant to the concessions and water rights claimed by it, and the people of Porto Rico will, subject to the conditions and limitations hereinafter specified and at the times, places and subject to the conditions of delivery hereinafter provided for, make delivery to the Fortuna Estates for the irrigation of the said tracts of land" of said amounts of water.

It is further pointed out in that opinion that the reduction in the amounts of water allowed from an aggregate of 11,032.78 acre feet to 8,258.98 acre feet (about 75 per cent.) was grounded on the principle of equivalence, and the variation in percentage to the different estates rested on the order of suspension in times of shortage.

It thus appears that the amounts of acre feet of water per year agreed upon in that contract were the equivalent in value of the old water rights or concessions which Fortuna Estates owned and which it had not relinquished to the people of Porto Rico, and that the people of Porto Rico agreed to deliver those amounts uniformly throughout the year and further specified the number of feet to be delivered per day, and the consideration therefor was the right acquired by the people of Porto Rico to carry out its irrigation scheme and operate its dam and hold back and store therein the waters of Jacaguas river, which otherwise it could not do, for the Irrigation Act of 1908, as amended in 1911 and 1913, did not make any of the lands here in question a part of the irrigation district thereby constituted. The lands embraced in the district consisted of three classes: (1) Lands which had no water rights, appurtenant or otherwise; (2) lands as to which the old water rights or concessions, appurtenant thereto, had been condemned and paid for by the irrigation system; and (3) lands as to which the old water rights or concessions appurtenant thereto had been relinquished on the condition that their values should be applied to defray their proportion of the construction, maintenance, and operation of the system. But in 1921 the

Legislature of Porto Rico, in section 1 of the Act No. 49, provided:

"That a special tax is hereby levied in addition to other taxes already fixed by law, on all parcels of land which for irrigation purposes are supplied with water from the southern coast public irrigation system constructed and in operation pursuant to the provisions of the Public Irrigation law and amendments thereto, *but which* under the *present Irrigation Law in no way contribute to the payment of expenses for the maintenance of said system.*" (Italics ours.)

In other words, by this act the Legislature of Porto Rico, without making these lands a part of the irrigation district, imposed a special tax upon the defendants because of the water agreed to be supplied from the irrigation system under the contracts of August 26, 1914, and which the people of Porto Rico were to deliver as the equivalent in value for the old water rights that the defendants owned, the latter rights being suspended during the continuance of the contracts. People of Porto Rico v. Russell & Co. (C. C. A.) 268 F. 730. It is the imposition of this burden upon their right under the contracts to receive the amounts of water there stipulated for of which the defendants complain that the Legislature of Porto Rico, in enacting the law, violated section 2 of the Organic Act (48 USCA § 737), which provides that:

"No law impairing the obligation of contracts shall be enacted."

We fail to see how it can be contended that this act does not impair the obligation of the contract which the people of Porto Rico made with Fortuna Estates, and likewise of the contract which they made with Mr. Poventud and his co-owners; and we have been unable to find in the briefs of counsel for the plaintiff any argument or suggestion leading to a contrary conclusion. The act clearly imposes a burden upon the defendants' right to receive the waters agreed to be delivered to them by the people of Porto Rico as a substitute for their old water rights.

The Supreme Court of the United States, in considering a like provision of the federal Constitution from which this provision of the Organic Act was undoubtedly taken, said:

"A State can no more impair, by legislation, the obligation of its own contracts, than it can impair the obligation of the contracts of individuals. We naturally look to the action of a sovereign State, to be char-

acterized by a more scrupulous regard to justice, and a higher morality, than belong to the ordinary transactions of individuals." Woodruff v. Trapnall, 10 How. 190, 207, 13 L. Ed. 383. See, also, Fletcher v. Peck, 6 Cranch 87, 3 L. Ed. 162; Green v. Biddle, 8 Wheat. 1, 92, 5 L. Ed. 547; Hall v. Wisconsin, 103 U. S. 5, 26 L. Ed. 302; Antoni v. Greenhow, 107 U. S. 769, 795, 2 S. Ct. 91, 27 L. Ed. 468.

And as to whether a state or a municipality, under the guise of levying taxes, may impair the obligation of a contract, the Supreme Court in Murray v. Charleston, 96 U. S. 432, 24 L. Ed. 760, said:

"We do not question the existence of a State power to levy taxes  *  *  *  nor the subordination of contracts to it, so far as it is unrestrained by constitutional limitation. But the power is not without limits, and one of its limitations is found in the clause of the Federal Constitution, that no State shall pass a law impairing the obligation of contracts. * * * The constitutional provision against impairing contract obligations is a limitation upon the taxing power, as well as upon all legislation, whatever form it may assume." (Page 444 of 96 U. S., 24 L. Ed. 760).

"There is no more important provision in the Federal Constitution than the one which prohibits States from passing laws impairing the obligation of contracts, and it is one of the highest duties of this court to take care the prohibition shall neither be evaded nor frittered away. Complete effect must be given to it in all its spirit. The inviolability of contracts, and the duty of performing them, as made, are foundations of all well-ordered society, and to prevent the removal or disturbance of these foundations was one of the great objects for which the Constitution was framed." (Page 448 of 96 U. S., 24 L. Ed. 760).

See, also, Cooley on Taxation (4th Ed.) § 36, p. 18.

It seems to us that this act amounts to saying that in the future Fortuna Estates' right to receive the water which the people of Porto Rico contracted to deliver to them in substitution for their old water rights and concessions shall be subject to their paying the taxes in question and impairs the obligation of the people of Porto Rico to furnish to Fortuna Estates water which the former agreed to deliver the latter.

█ Error is also assigned to the ruling of the court that Act No. 49 of 1921 is void on the ground that it delegates to administrative officers the legislative function of levying taxes. By section 2 of that act the Legislature prescribes a method by which the rate and amount which lands having water rights exchanged for old concession by the contracts of August 26, 1914, should be taxed to help defray the expenses of maintaining and operating the irrigation system. According to the method there pointed out, the treasurer is first to determine the total number of acres in tracts of land receiving water from the irrigation system, including therein: (1) Tracts of land subject to taxation under the irrigation law to pay the *cost* of the irrigation works (these are lands included in the irrigation district that had no appurtenant water rights, or, if they had any water rights, they had been condemned and paid for); (2) tracts of land (included in the irrigation district), the water rights appurtenant thereto the owners had released and had credit for; (3) tracts of land (outside the irrigation district) having water rights which had not been relinquished and which, under the contracts with the people of Porto Rico, were to be delivered in whole or in part *at the canals* of the irrigation system and be there measured; and (4) tracts of land (outside the irrigation district) having water rights that had not been released and paid for, which, under contracts with the people of Porto Rico, were to be taken and measured in the river at the points of intake indicated *in their old concessions.*

In determining the amount to be raised, the Treasurer of Porto Rico is directed to take the *amount estimated by the Commissioner of the Interior* to defray the cost of operation and maintenance of the irrigation system for the following fiscal year (the estimate of the commissioner to be made and certified as provided in section 11 of Act No. 128 of August 8, 1913), and add to this estimated amount or subtract therefrom, as the case may be, any resulting deficit below or surplus above the amount expended for operation and maintenance of the system the preceding year. The treasurer is then to divide the amount so determined by the total number of acres (arrived at as prescribed in the act) to get the tax rate per acre to be levied during the subsequent fiscal year on lands outside the district which are not subject to a tax to meet the cost of the system.

The provision complained of in section 2 of Act No. 49 as delegating legislative power is the one requiring the treasurer in ascertaining the rate for assessing the tax to take the "amount estimated or certified to as estimated by the Commissioner of the Interior

for defraying the cost of operation and maintenance of the irrigation system during the following fiscal year." The contention is that the Legislature could levy and authorize the assessment of the tax in either one of two ways. It could itself fix a flat rate at which the receivers of water could be taxed per acre foot, or it could itself determine the amount of money to be raised for the ensuing year to defray the expenses of maintenance and operation, but that it could not delegate the determination of that amount, and thereby the rate, to the discretion of the Commissioner of the Interior; that the determination of the amount to be raised or the rate is a legislative matter involving discretion, which the Legislature cannot delegate to administrative officers.

Counsel for the plaintiff, however, contend that the determination of the *amount to be raised* for an ensuing year is a pure matter of computation, and that the act has pointed out how that computation shall be made. But this clearly is not so, for the amount to be raised is, by the terms of the act, to be estimated by the Commissioner of the Interior, and as this estimate involves the exercise of legislative power, it could not be delegated to the commissioner.

In Van Cleve v. Passaic Valley Sewerage Commissioners, 71 N. J. Law, 574, 60 A. 214, 108 Am. St. Rep. 754, the court, in discussing a kindred matter, said:

"Every system of taxation consists of two parts—the elements that enter into the imposition of the tax, and the steps taken for its assessment and collection. The former is a legislative function conserved by constitutional prescriptions; the other is mere machinery. The latter may be delegated to other than governmental agencies; not so the former. Matters of computation, appraisement, adjustment, and such like, involving mere certainty of detail, follow the delegable power. * * * But no element that enters essentially into the tax itself may be so delegated. Citing State v. Sickles, 24 N. J. Law [4 Zab.] 125; State v. Koster, 38 N. J. Law [9 Vroom] 308; and Munday v. Assessors of Rahway, 43 N. J. Law [14 Vroom] 339. * * * 'These decisions are precedents in our own courts, affirming the want of power in the legislative body in which the power of taxation is vested to delegate the authority to others to determine, in its judgment or discretion, the amount to be raised by taxation.'" (Page 581 of 71 N. J. Law, 60 A. 214, 217, 108 Am. St. Rep. 754.)

It is also said:

"* * * This court is unequivocally committed to the doctrine that the Legislature of this state, in which the governmental power of taxation resides, does not possess the power to delegate * * * the authority to determine, in its judgment or discretion, the amount to be raised by taxation, to which obviously must be added that such authority is in effect so delegated if such body may be empowered to levy taxes to the amount of an indebtedness to be incurred by it in its judgment or discretion." (Page 583 of 71 N. J. Law, 60 A. 214, 217, 108 Am. St. Rep. 754.)

See, also, Cooley on Taxation (4th Ed.) vol. 1, pp. 184, 194; vol. 3, p. 2044; 37 Cyc. p. 725.

As the conclusions reached dispose of the case, we do not think it necessary to consider the other questions raised.

The judgment of the District Court is affirmed, with costs.