[Nos. 23654, 23655.   Department Two.   May 19, 1932.]

J. F. BLEAKLEY *et al., Appellants,* v. PRIEST RAPIDS
IRRIGATION DISTRICT *et al., Respondents.*

*In the Matter of the Petition of the Board of Directors
of* PRIEST RAPIDS IRRIGATION DISTRICT.[1]

[1]Reported in 11 P. (2d) 597.

*LaBerge, Cheney & Hutcheson,* for appellants.

*Fred J. Cunningham* and *T. T. Grant,* for respondents.

MILLARD, J.—J. F. Bleakley and other owners of land in the Priest Rapids Irrigation District brought an action to enjoin the district from issuing and selling bonds and to have the plaintiffs' land excluded from the district. The board of directors of the district instituted an action to obtain confirmation of a bond issue proposed by the district. A trial to the court of the two causes, which were consolidated, resulted in judgment of dismissal of the first action and a decree of confirmation in the second cause. From those judgments, plaintiffs in the Bleakley action, who were defendants in the confirmation proceeding, appealed.

The Hanford Irrigation & Power Company sold certain lands in Benton county along the Columbia river, and granted to those lands a perpetual water right. In 1915, the Hanford Irrigation & Power Company conveyed to the Black Rock Power & Irrigation Company and the Consumers Ditch Company the power and irrigation instrumentalities used to deliver water

to those lands. The water deeds provided for thirty-two inches of water (about one-third of the quantity needed) each year for irrigation. The landowner was required to pay the cost of delivering the water. In some instances, the cost of constructing laterals from his land to the main canal was imposed upon the landowner. All of the landowners did not avail themselves of the water privilege. The main irrigation canal was run close to the Columbia river. All of the lands, with a few exceptions, sold with water rights lay in elevation below the elevation of the canal and between the canal and the river.

The Black Rock Power & Irrigation Company and the Consumers Ditch Company became insolvent and unable to carry out the water right obligation. These two companies surrendered the power and irrigation instrumentalities to the Federal court, which placed them in the hands of a receiver. During the period of the receivership, about twelve hundred acres of water right lands were supplied with water on certain charges fixed by the Federal court against the water right landowners. Approximately three times the amount of water provided for in the water deeds of the water right landowners was supplied by the receiver to such landowners. After four years' operation by the receiver of the irrigation and power instrumentalities, the Federal court announced that same would be sold at receiver's sale. On December 10, 1930, a decree was entered ordering the sale of the properties.

The Priest Rapids Irrigation District was organized in 1920. There were, including the above mentioned lands which had been sold with perpetual water rights, within the boundaries of the district sixty-four thousand acres of land in Yakima and Benton counties. The board of directors of the district decided that the

district organization should acquire the instrumentalities which the Federal court ordered sold, to secure the additional water which would be thereby made available, and also to save vested water rights appurtenant to a portion of the lands within the district.

On or about February 17, 1931, the district board entered into an agreement with a certain railroad company whereby the latter obligated itself to purchase one hundred thousand dollars of the bonds of the district, when authorized, and to advance on account thereof five thousand dollars to be used as a deposit for the district's bid at the receiver's sale. Pursuant to the decree of the Federal court, a receiver's sale was held. The district bid the upset price of forty-five thousand dollars for the properties offered at the sale. A like offer was made shortly after the sale by another bidder, but that bidder made no deposit.

On March 30, 1931, at a special meeting of the board of directors of the district, a resolution was passed adopting a plan of development for irrigation of the lands below the main irrigation canal. The amount of money necessary for the development was estimated at one hundred and twenty-five thousand dollars. The resolution provided for the calling of an election to authorize the issuance and sale of bonds in the amount named to effectuate the plan adopted. The landowners affected were timely notified of the action of the board, and were advised that, if they desired to have their lands excluded from the district, petitions should be presented before bonds were issued.

A group petition covering the lands within the district in Benton county above the canal, and individual petitions covering all of the lands within the district in Yakima county, were received by the board. One hundred and seven individual petitions covering lands

within the district below the canal were filed. The petitions were duly noticed and acted upon by the board.

The appellants do not represent any water right lands above the canal. With the exception of the land of appellant Strasser, the lands of the appellants are water right lands. All of the lands of the appellants are below the canal. As the lands above the level of the canal did not receive any water from the district, the board excluded all of those lands from the district. An election, held pursuant to the statute, authorized by a substantial majority the exclusion of the lands approved by the district board. A bond election held in the irrigation district resulted (181 to 106) in favor of the one hundred and twenty-five thousand dollar bond issue. Thereafter, two actions were instituted, and culminated as recited above.

It is first contended that appellants' lands would have been excluded from the district if the district board had fairly applied the following principles, which the board announced it would act upon in considering the petitions for exclusion:

(1) That all lands having an adequate supply of water from a source independent of the canal should be excluded. (2) That all petitioning land that was low and subject to seepage should be excluded. (3) That all petitioning land higher in elevation than the canal should be excluded.

The trial court correctly refused to substitute its judgment for that of the district board. The appellants failed to sustain the burden of showing their lands were not benefited from the operation of the irrigation district. There was no showing that the board acted fraudulently or arbitrarily. In the absence of a showing of fraud or arbitrary action, the exercise by

the district board of the legislative or administrative function of passing upon petitions for exclusion of lands from the district, is not reviewable by the courts. 25 R. C. L., pp. 108-109; *Hand v. Eldorado Irrigation District,* 97 Cal. App. 740, 276 Pac. 137.

The determination of the district board in denying or granting the petitions for exclusion was an exercise of discretion, and was considered, in conformity with the well settled rule, by the trial court on the record before the district board. The board having exercised its discretion, and fraud or arbitrary action not being established by the record, "the courts cannot interfere, even though they may be convinced that the wrong result was reached." *In re Drainage District No. 10,* 119 Wash. 8, 204 Pac. 1050.

A landowner is not entitled to exclusion of his land from an irrigation district for the sole reason that such land has an individual water right. Such tract of land would be benefited from the ability of the irrigation district to furnish water in times of emergency, to supply better or cheaper service, and to furnish electric energy or domestic water. In nearly every instance, the lands of the appellants were using or had need of the water from the canal which the district proposes to acquire. The district officers are required by the statute (Rem. Comp. Stat., §§ 7418, 7436) to give to the lands with a water right equitable credit on the assessment roll.

That the district board observed the rules of law applicable to the exclusion of lands from irrigation districts, plainly appears from the following review of the individual petitions of the appellants for exclusion:

J. F. Bleakley and Bleakley Fruit Company own one hundred and ten acres of water right land. Mr. Bleakley claimed that, of this tract, eight to ten acres were

low and sub-irrigated, hence should have been excluded; that only fifty acres of the tract obtained water from the canal, and that, as to the remainder of the land, sufficient water can be obtained by digging a well. The record does not disclose that these petitioners appeared before the board in support of their petition for exclusion, or that they submitted proof as to the area which was sub-irrigated. A member of the board testified that the board did not have any evidence that any of the tract was seepage land, and that, in the opinion of that member, there were not more than two or three acres of seepage land; that the petitioners had no means of irrigation other than from the irrigation canal. The sub-irrigation of the eight acres was caused by seepage from petitioners' adjoining lands, and from the lateral Mr. Bleakley was required to maintain. Such swamp or non-irrigable land as may be in this tract, the owners may require the district to deduct from the acreage assessed by the district in the assessment roll. These lands are not entitled to exclusion for the lone reason that it is possible for the landowner to dig a well.

B. Salvini *et ux.* own twenty acres of water right land, and have been irrigating the entire acreage with water from the irrigation canal. They never used their well for irrigation except to use the electricity to the amount of the minimum charge. No evidence was submitted to the board as to the capacity of the well on this tract.

W. L. Enyeart *et ux.* own twenty acres of water right land. They have no well. Mr. Enyeart testified that the thirty-two inches of water to which he was entitled under his deed was not adequate; that he did not desire to get a portion of his water from the irrigation district and a portion from another system; that he usually got an extra contract allowance in June

and a third allowance in September. He also testified that he could dig a well and install a pump if needed to obtain water for irrigation. We reiterate that the possibility of a well is not a ground for exclusion.

S. Garsi owns thirteen and one-half acres of water right land. While he has a well, he has been using water for irrigation purposes from the canal since 1924. He testified that he could not afford to pump water from his well—it was too expensive.

Edward Peterson *et ux.* own ten acres of water right land. While they have a well upon their tract, the appellants offered no proof as to the showing made by Peterson *et ux.* before the district board in support of their petition for exclusion of their lands from the district. They have been using water from the Priest Rapids irrigation canal.

· E. W. Heard *et ux.* own twenty acres of water right land, and have their own well and pump. While Mr. Heard testified that his well was of sufficient capacity to irrigate the twenty acres, he also testified that he had never used his well for irrigation, and that, since the receivership, he had been obtaining plenty of water from the irrigation ditch.

W. D. McKay *et ux.* own twenty acres of water right land, upon which they do not reside. They have no well. These parties did not appear or testify at the trial. They abandoned the land, as they could not get enough water from the ditch because of the condition of their laterals. Under the terms of the water contracts with the companies operated by the receiver, the duty of maintaining the laterals devolved upon the landowners. Water is available in the irrigation canal for these petitioners.

Martin F. O'Brien, a water right landowner, petitioned for the exclusion of forty acres on which he had

a well and pump. Twenty acres were excluded, the board being of the view that the well would only furnish water for twenty acres. There was no evidence that Mr. O'Brien made any showing before the district board as to the capacity of the well.

David Hartman *et ux.* own ten acres of water right land. While they have a well, which Mr. Hartman testified was of sufficient capacity to irrigate the tract, Mr. Hartman also testified that he has been getting an adequate supply of water from the irrigation canal, and that he never pumped water for irrigation.

Charles Mack and C. F. Wooten *et ux.* own ten acres of water right land which is now being irrigated from the canal. They have a well, which has been used for domestic purposes only. To pump water for irrigation, it would be necessary to dig another well. We repeat, the possibility of obtaining additional water from a well is not a ground for exclusion.

Robert W. MacDonnell *et ux.* petitioned for the exclusion of thirty acres of water right land. The petition was granted as to twenty acres, but denied as to ten acres to which they did not have title. They failed to obtain, as requested, the owner's signature to the petition to exclude the ten acres. The statute requires the holder of the legal title to sign the petition for exclusion.

Charles H. Pierson *et ux.* own three acres of water right land on which is a well from which water can be withdrawn by a hand pump. These petitioners never pumped water from the well for irrigation purposes. They were getting water from the irrigation canal in 1930.

Elizabeth Grant owns five acres of water right land and five acres of non-water right land on which is a well which, it was testified, was of sufficient capacity to irrigate her land. She did not appear before

the board in support of her petition for exclusion. It appears that, for irrigation purposes, she has been using water from the irrigation canal and from her well.

Joseph De Riegio, administrator of the estate of Crudeli De Riegio, deceased, was not permitted to vote at the exclusion election because he had not qualified as administrator. His petition for exclusion was filed subsequent to the election, and his petition had not been acted upon by the district board at the time of the trial of the cases at bar. The question of exclusion of this tract cannot be considered in the instant cases.

Mark Whelan *et ux.* own thirteen acres of water right land below the level of the irrigation canal, on which they do not reside. They have a well, from which they have never pumped water for irrigation. There is no showing that they appeared before the district board and submitted evidence in support of their petition for exclusion.

James Calza *et ux.* own twenty acres of water right land. They have no well on their land. They use water from the irrigation ditch.

W. H. Wehmeier· *et ux.*, owners of fifteen acres of water right land, which is in orchard and highly improved, have, it was testified at the trial of the cases at bar, a well on their land. They have been using water from the canal for irrigation. There is no showing that these petitioners offered any evidence at the hearing before the board that they had a well.

H. H. Boie *et ux.* own twelve acres of water right land on which, it was testified, was a well. There was no testimony that they ever used water from their well for irrigation. Their petition can not now be considered, as same was pending before the district board at the time of the trial of the cases at bar.

T. A. Spratlen *et ux.*, owners of ten acres of water right land, have a well, but have been obtaining water from the irrigation canal. Their petition can not be considered, as that petition was pending before the district board at the time of the trial of the cases at bar.

The exclusion of the water right land of Ben C. Root *et ux.* is not an issue in the cases at bar. They did not file a petition for exclusion of their lands until after the exclusion election, which petition has not been acted upon by the board. It appears that they have a well which was used for domestic purposes solely, and that they obtained an adequate supply of water for irrigation from the canal during the receivership.

Harriette Stewart and A. L. Branin, water right landowners, did not present petitions for exclusion of their lands prior to the time of the trial of the cases at bar. The question whether their lands should be excluded from the district is not before us.

J. H. Greutzmacher *et ux.* own ten acres of water right land, for irrigation of which they obtain water from the canal.

J. W. Strasser, who now resides in Seattle, owns sixteen acres of non-water right land on which there is a well. The land has not been irrigated or cultivated for about two years. It was testified at the trial of the cases at bar that the well was of ample capacity to irrigate the tract, and that the land had never been irrigated from the irrigation canal. Mr. Strasser did not appear before the board at the time of the hearing on his petition for exclusion. One witness testified at the trial of the cases at bar that he appeared before the board with reference to another tract of land and questioned a member of the board concerning the Strasser land; that that member of the board told the witness the Strasser land was not excluded because

Mr. Strasser did not have any means of irrigating his land other than from the canal. No proof was offered to the district board by that witness or by any one else . regarding the well on the Strasser land.

Appellants next contend that the district board, in passing on petitions for exclusion, denied appellants' petitions, but excluded other petitioners' lands which were similar to lands of the appellants. The record, which we have carefully examined, does not sustain this claim of arbitrary and discriminatory action on the part of the district board.

■ ■ Appellants insist that the assessments against their lands should be enjoined. Appellants argue:

"The court should enjoin the irrigation district and its officers and directors, respondents herein, from levying, collecting, making or charging any assessment against appellants' land (other than water maintenance charges pursuant to their water right deeds) and particularly for the payment of the purchase price of said power and irrigation system or for the payment of principal or interest of said proposed bond issue. Appellants have already purchased and fully paid for their water rights. Their water rights are not merely contractual, but as adjudicated by one of the highest Federal courts of the land, constitute an actual present and perpetual trust, an equitable estate, property right and ownership in the power and irrigation system itself. To levy assessments against appellants' lands for this purpose obviously is nothing more nor less than to require them to pay a second time for the purchase of the water rights which they already own and have already fully paid for."

The Hanford Irrigation & Power Company, owner of the power and irrigation instrumentalities and also owner of the lands to be irrigated, sold lands to the appellants with the agreement to perpetually supply to those lands, at certain rates, a specified amount of

water for irrigation purposes, upon certain conditions to be performed by the land purchasers. Subsequent to the appointment of a receiver for the successors in interest of the appellants' grantor, the Federal court held (*Adamson v. Black Rock Power & Irrigation Co.,* 297 Fed. 905; *Adamson v. Black Rock Power & Irrigation Co.,* 12 Fed. (2d) 437, and *Boie v. Black Rock Power & Irrigation Co.,* 16 Fed. (2d) 114), that the right of receiving the water was appurtenant to the lands sold to appellants; that the covenant to furnish water in the amount specified was a burden in perpetuity upon the instrumentalities devoted to that purpose; and created an equitable estate in those instrumentalities for the benefit of the water right landowners as defined by the terms of such landowners' deeds of purchase. That is, the water right landowners do not own the power and irrigation instrumentalities, but have an undivided interest in the instrumentalities to the extent required to supply to appellants' lands water in amount and season reasonably necessary, but limited by their deeds of purchase. The court said, in *Adamson v. Black Rock Power & Irrigation Co.,* 297 Fed. 905:

"Adverting to the circumstances, the settlor was promoting an irrigated lands enterprise. The water, and not the land, was the more important consideration to purchasers. The settlor mortgaged the lands, water rights, and necessary instrumentalities. To avoid distrust in prospective vendees, to inspire them with confidence that land and water joined and bought at high prices would never be severed, that the water right would be perpetual in performance as in promise, and to induce them to buy, this declaration of trust was made in the mortgage and published to all prospective vendees. In it the settlor declared that these instrumentalities, necessary to the enjoyment of the lands and water rights by it sold, are 'pledged perpetually' to the use of its vendees; that is to say, not

in possession, and as a lien to be foreclosed, sold, and diverted from the uses covenanted, but by the settlor and its successors, including any purchaser on foreclosure of the trust deed, to be forever held in trust and appropriated to the use and benefit of the vendees. The instrumentalities mortgaged were no more to be alienated from the vendees than were the lands and water rights equally mortgaged and thereafter purchased by the vendees. The latter's purchases were in reliance upon this promise, and are the beneficiaries' acceptances of the trust.

"To the extent of these instrumentalities the declaration of trust is as definite and valid as the mortgage deed of them, however it may be in respect to other property and not here involved. It is here emphasized that in arid land irrigation enterprises, and including this one, the water right not only is a thing granted, but generally and here is the principal thing granted, for which the always large consideration is almost wholly paid, and without which probably no sale could be made save at nominal prices.

"Appellants' deeds admitted them into the class of beneficiaries of the trust, prescribed the terms, and vested them with the rights thereof as co-tenants, and charged with proportionate expense of maintenance and operation. These rights are preserved by the decree of foreclosure, survived the receiver's sale, and in the instrumentalities are an equitable estate of which appellants cannot be deprived. The extent of that estate is measured by and is sufficiently definite in the deeds of purchase, as definite as any water right and deed thereof can or need be, viz. the perpetual use of the instrumentalities to the extent required to supply to appellants' lands water in amount and season reasonably necessary, but limited by their deeds of purchase.''

The district is not seeking to disturb vested rights of the appellants. It is the purpose of the district to acquire property upon which appellants' vested rights depend, in order to preserve those vested rights. To the appellant owners of vested rights will be given,.

as the statute requires, equitable credit on the assessment roll when assessments are levied.

In purchasing at receiver's sale the power and irrigation instrumentalities, the district was not attempting to acquire the appellants' interest therein. It was the purpose of the district to acquire the title interest in the instrumentalities, to which the right of the water right landowners was an incident. The appellants can not irrigate their land from their water right alone. It is essential that the instrumentalities be acquired by the district, or some other organization, to afford facilities for delivery to the water right landowners additional water which is necessary to the successful cultivation of their lands.

The insolvent owners' title to the power and irrigation instrumentalities was surrendered to the Federal court. There were certain expenses incident to the care and protection of the instrumentalities during the period of the receivership. During the irrigation season, the receiver supplied the appellant water right landowners three times the amount of water specified in the deeds of such landowners. When there was no money available for repair of the irrigation system, repairs without which the landowners would not have had water for irrigation, the receiver, through the co-operation of the district, sold receivers' certificates, repaired the irrigation system, and supplied the water.

The costs incurred in the care and protection of the power and irrigation instrumentalities must be paid. That expense is a charge against the title superior to the title of the water right landowners. If those costs are not paid, the water right landowners will lose their water rights. It is clear that the district can not be enjoined from levying assessments against the lands of the appellants to pay those costs and to acquire title to the instrumentalities upon which

their water rights rest. All that the Federal court asks is that the district pay the expenses necessarily incurred by the court in protecting the instrumentalities for the benefit of the water right landowners. In its decree of sale, the Federal court said:

"The receivership in this cause has been prolonged far beyond the time anticipated when the court appointed such receiver, at the initiation of this litigation. Such receivership has only thus been continued for the purpose of enabling the parties in interest to effect some form of financial reorganization that would assure at receivership sale a purchaser able and willing to carry on and perform the various obligations involved in the conduct of such irrigation enterprise. The various efforts heretofore made by parties in interest to perfect such reorganization and/or to procure a purchaser of the assets at receiver's sale have been so far fruitless. This court has become convinced that it is not practicable or feasible to continue indefinitely the operation of these properties by receivership, inasmuch as the receiver is necessarily without funds or credit with which to make essential repairs and replacements on the property involved in said receivership.

"It is apparent to this court that, although the receiver has performed his duties with the utmost faithfulness and competence, a continuance of the receivership beyond the present time will work seriously to the detriment of the irrigation enterprise whose facilities are involved in this litigation.

"After a review by the court of the history of this irrigation enterprise, it appears to the court that it is to the interest of all concerned, and essential in the highest degree that this receivership should now be closed, and that the parties in interest should be obliged by receivership sale to agree upon and complete at this time such reorganization or such new financial structure as is possible to enable them to acquire and carry on the irrigation enterprise heretofore conducted under the supervision of this court by said receiver, to the end that the irrigation plant and

enterprise may be rescued from its appearance of continuing insolvency, that much needed improvements may be made thereon, and that suitable inducements may be offered to new settlers to acquire rights and share in the benefits and help with the burdens of the enterprise.

"It is further clear to this court that, if those having interests in this enterprise either will not or can not agree upon and finance a program of reorganization, that then the properties subjected to this receivership must, nevertheless, be sold to whomsoever can be found to purchase them, and if no better price be obtained, for whatever price that may be offered that will liquidate the obligations incurred herein."

With reference to the contention of the appellants that they will receive no benefits from the district's plan of development, the trial court aptly said:

"I can see how proponents of the bond issue can visualize a community up in that section of this county which will surpass almost anything else in the state of Washington. With the sum of something like seventy-five or eighty thousand dollars, they are acquiring properties that have cost individuals and groups, I take it from the exhibits in this case, sums ranging from three quarters of a million to one million dollars. Power possibilities there are exceptional. Water rights to the lands are valuable, though it is a fact that not a single land owner in that district can successfully farm an acre of the ground from his water right alone. He will have to supplement it from some source. It seems it is easy to supplement the water from the use of wells, but, as one witness testified, no one wants part of his water from a ditch and part from a well. He wants it all from one source or the other source.

"The excess power that this irrigation district can develop, according to the evidence of Mr. Chase, would make it quite feasible and practical to furnish electrical energy at a rate, it seems, far less than it is now costing; as some witness testified yesterday, the electrical energy bill alone is some $15 or $16 per acre

per season, which almost creates an excessive situation.

"Now, as to the legal questions raised, Mr. Hutcheson, on the question of merger, the question of the rights of the district is interesting and novel, but I am not at all persuaded that our supreme court would hold with you in that regard. This is an unusual situation, a novel situation. I don't know of another irrigation district existing in the United States or anywhere else, that has a situation exactly as the one that is presented here, but the primary object, I am convinced, of the men and women supporting the majority position in this matter, is to save these valuable water rights, in a certain way valuable, not even an asset if you depended upon them alone, because you could not irrigate with that amount of water alone, yet a liability that no private company would want to undertake, and doubtless, the only reason that the insolvent company, the Black Rock Power & Irrigation Company, or whatever the name was, did not go on with their plans, was that they found this encumbrance established by the Adamson decree. Without the land having that right, doubtless the district can continue by pumping, but will be largely at the mercy of the group or individuals selling them electrical energy.

"Now, it has been indicated here by some of the persons who oppose the program of the directors of this district, that it is a scheme or plan whereby their valuable rights will ultimately be lost to them, to some private power concern. The very fact that those rights pass into the hands of a quasi-municipal corporation such as an irrigation district, is the best argument in the world that that situation could not happen, because it can only occur after the people of that district as a whole consent to it. If those rights would pass into the hands of private individuals, then in all probability they would pass direct for the purpose of those private individuals' personal property; so it seems to me that the fear that the minority seem to have concerning the future welfare of this district is not well founded."

The statute provides that,

"Any lands included within any [irrigation] district which have a partial or full water right shall be given equitable credit therefor in the apportionment of the assessments in this act provided for; . . ." Rem. Comp. Stat., § 7418.

"Assessments made in order to carry out the purposes of this act shall be made in proportion to the benefits accruing to the lands assessed and equitable credit shall be given to the lands having a partial or full water right: Provided, that nothing herein shall be construed to affect or impair the obligation of any existing contract providing for a water supply to lands so assessed, unless the right under such contract shall first have been acquired by said district, . . ." Rem. Comp. Stat., § 7436.

Manifestly, until there has been a violation or a threat to violate the provisions of the foregoing statute, the appellants are not entitled to an injunction restraining the levy of district assessments. Bonds issued and sold by the district are subject to the foregoing statute.

The appellants further contend that the failure of the trial court to order the exclusion of their lands from the district, or in the alternative to restrain the district from levying any assessments against their lands for bond purposes, violates their constitutional rights—impairs their contract rights and deprives them of their property without due process of law.

Appellants' contract rights were rendered of little or no value by the insolvency of the obligors and their abandonment of the project. It is the purpose of the district to restore those rights. Unless such a plan— to increase the amount of water, to provide means of delivery, and to reduce the cost of same—as proposed by the district is effected, the present inadequate water rights of the appellants will be worthless.

The purchase by the district of the power and irrigation instrumentalities is not an interference with appellants' contract rights. True, the water right of each appellant is a vested right in real property. However, there is no showing that the district has any intention of interfering with the vested rights of the appellants in the constitutional sense.

Appellants' lands are not being added to the district. Those lands were included within the boundaries of the district when the boundaries were fixed by the county commissioners. The order of the county board including such lands was examined by the superior court, which entered a decree approving and confirming the same. Later, the district board adopted a plan —a matter within the discretion of the board—of development. Appellants' objection now to that plan of development is an insufficient ground for the exclusion of the lands of the appellants, as those lands are irrigable and have only a partial water right. To hold otherwise would be to permit a collateral attack of the decree of the superior court adjudging appellants' lands to be legally within the district.

Appellants insist that the amount ($125,000) of the bond issue is excessive. It is argued that, to pay the purchase price of $45,000 for the power and irrigation instrumentalities, to pay the taxes of $14,000 against the properties, to pay the cost of repairs of the system, and to compensate the officers and employees of the district, a bond issue of $75,000 would be ample.

The difference of business judgment between the appellants and the district board is fifty thousand dollars. The board made a reasonably accurate estimate (that was a matter for the judgment and discretion of the district board) of the amount of money required for the development of the district.

"The irrigation district statutes of this state are very liberal and vest the board of directors of the district with large discretion. It seems to have been the intent of the legislature to bind such boards with as few technicalities and to surround them with as few limitations and restrictions as possible. The statute does not require that the 'estimate' shall be based on any exact information or on any full and complete plans and specifications. It does not mean that, before making such estimate, the board must know and be able to point out the exact cost of the various items to be included within the estimate. It contemplates that the board shall have before it such information as that it may make a fair, honest, intelligent and reasonably accurate estimate. Nothing more is necessary. Indeed, the statute makes provision for supplying additional funds in the event the .amount estimated shall prove to be insufficient, and it anticipates that it may not be necessary to negotiate all the bonds which have been authorized." *Board of Directors, etc., Irr. Dist. v. Mineah,* 112 Wash. 325, 192 Pac. 997.

See, also, *Hanson v. Kittitas Reclamation District,* 75 Wash. 297, 134 Pac. 1083.

Under the statute (Rem. Comp. Stat., §§ 7432, 7433) the district may sell its authorized bonds from time to time as required; and if conditions change so that any bonds previously authorized are not required, they may be cancelled.

In making the estimate, the board had before it the records of the owners of the existing system and the experience and data in the hands of the receiver, who is a hydraulic engineer of many years' experience. This data was submitted to the state director of conservation and development, and his findings and recommendations obtained. The board then made an estimate of the probable amount of money necessary for the development of the district, and submitted to the electors a bond proposition based on that estimate.

Of the purchase price at receiver's sale, the board

will save five thousand dollars. Respondents estimate there will be a saving of ten thousand dollars on the item of discount on bonds if the railroad company purchases one hundred thousand dollars of the bonds at par, as it has offered to do. The item of fifteen thousand dollars for general taxes should be increased six to eight thousand dollars for the taxes for the years 1930 and 1931. Respondents state the estimate of five thousand dollars for clearing titles, bond election and other miscellaneous expenses, did not take into account the cost and expenses of the almost continuous litigation that has since transpired, and additional money will be required to meet these expenditures. The amount of the bond issue is not excessive.

To discuss the other assignments of error, which we have considered and found are without substantial merit, would unnecessarily extend this already lengthy opinion. We have examined all of the authorities cited. They are either in harmony with the views herein expressed or are distinguishable from the cases at bar.

The judgment is affirmed.

TOLMAN, C. J., BEALS, MAIN, and HOLCOMB, JJ., concur.