PUERTO RICO v. RUSSELL & CO., S. EN C.

No. 95. Argued February 3, 4, 1942.—Decided March 16, 1942.

Mr. *William Cattron Rigby*, with whom *Messrs. George A. Malcolm*, Attorney General of Puerto Rico, and *Nathan R. Margold* were on the brief, for petitioner.

Mr. *George M. Wolfson* for respondent.

Mr. Justice Roberts delivered the opinion of the Court.

The question for decision is whether a statute of Puerto Rico impairs the obligation of certain contracts in violation of the Island's organic law.[1]

The respondent's predecessor in title, Fortuna Estates, as owner or lessee of lands adjacent to the Jacaguas River, enjoyed under Spanish law, and respondent, as successor, still enjoys, rights appurtenant to the lands to draw from the river 12,612.1 acre-feet of water per year for irrigation.

Puerto Rico adopted a law in 1908[2] which authorized an irrigation system, as part of which a dam was to be erected in Jacaguas River above Fortuna's intakes. Fortuna's lands were not within or a part of the irrigation district. Although the operation of the system would interfere with Fortuna's water rights, they were not condemned, as the statute permitted, nor were they voluntarily surrendered.

By an amendatory law adopted in 1913,[3] it was provided: "In the case of any land carrying a water right or concession of which the source of supply is destroyed or impaired by the construction or operation of the irrigation system, which shall not have been relinquished or surrendered to the People of Porto Rico, such land shall be entitled to receive from the irrigation system an amount of water which is the reasonable equivalent in value of the said water right

---

[1] "No law impairing the obligation of contracts shall be enacted." 48 U. S. C. § 737.

[2] Act of September 18, 1908, Laws of Porto Rico, 1909, p. 152.

[3] Act of August 8, 1913, Laws of Porto Rico, 1914, p. 54, § 13.

or concession." This Act empowered the Commissioner of the Interior to make agreements with holders of such rights, fixing the amount, and the time, place, and conditions of delivery, of water to be received as the equivalent of the rights suspended.

In the exercise of this authority the Commissioner executed contracts with Fortuna which called for the suspension of its rights appurtenant to two large tracts during the life of the contracts and assured delivery of a specified amount of water at Fortuna's intakes as the fair equivalent of the rights suspended.

Each contract enumerated the rights to take water appurtenant to a described tract of land which would be impaired or interrupted by the operation of the irrigation system; recited that the amount of water taken by Fortuna under its rights varied throughout the year, due to differences in rainfall, so that it was impossible to determine in advance the amount of water to which it would be entitled in any given period; and that Porto Rico was willing to deliver from the Jacaguas River the water to which Fortuna was entitled, but, in order to make the operation of the system more certain, desired to agree upon a fixed and regular amount which should be received by Fortuna as the fair equivalent in value for irrigation purposes of the water it would ordinarily take and use under its existing rights.

The contract then stated the agreement of the parties as to the quantities of water which, delivered in equal daily instalments, were to be considered such fair equivalents and the petitioner covenanted to deliver these quantities to Fortuna. It was also agreed that Fortuna might exercise its preëxisting rights for ten days in each year to prevent their loss by non-user.

Under the Irrigation Law, lands in a district were subjected to a uniform annual assessment per acre to discharge the cost of construction, maintenance, and operation of

the system. Sales were also made of surplus waters and the proceeds used for maintenance.

Shortly after the contracts were made, a controversy arose between petitioner and respondent with respect to Puerto Rico's right to sell surplus waters. Litigation ensued which terminated in a decree restraining the insular government from diverting certain surplus waters to which the respondent was held to be entitled under the contracts. The decision also upheld the validity of the contracts.[4]

Thereupon the legislature adopted, July 8, 1921, "An Act Fixing a Tax on Certain Lands using water from the Southern Coast Public Irrigation System, on which lands no Tax Whatever was Levied under the Public Irrigation Law, and for Other Purposes."[5] This is the statute enforcement of which is asserted to impair the obligation of the contracts. By this act a special tax is imposed on all lands supplied which, under existing law, contribute nothing to the expense of the maintenance of the system. The Treasurer of Puerto Rico is directed to compute the tax by finding the aggregate acreage receiving water from the system including lands, like those of respondent, outside the district but receiving the equivalents of their preëxisting rights under contracts. He is to assess a prorata share of the total expense against the lands of respondent and others similarly circumstanced. The Act, as is admitted, was aimed only at those who, like respondent, had contracted for the receipt of water in lieu of that to which they were of right entitled and whose lands were not a part of the irrigation district.

Action was instituted by petitioner in an insular court for the recovery of several years taxes so imposed.[6] The

---

[4] *Porto Rico* v. *Russell & Co.*, 268 F. 723.

[5] Act 49 of 1921, Laws of Porto Rico, 1921, p. 366.

[6] The preceding litigation and the necessity for bringing action for the tax rather than proceeding summarily will be found in *Gallardo* v. *Havemeyer*, 21 F. 2d 1012, and the Act of Congress of April 23, 1928, 45 Stat. 447.

cause was removed to the United States District Court, where a motion to remand was denied and a judgment entered for the respondent on the merits. The judgment was affirmed by the Circuit Court of Appeals for the First Circuit,[7] but was reversed by this court for want of diversity of citizenship on which jurisdiction of the federal courts depended.[8]

After remand, the case was tried in the insular district court and the complaint was dismissed on the merits, on the ground that Act No. 49, of 1921, was an invalid impairment of the obligation of the 1914 contracts. The Supreme Court of Puerto Rico reversed and rendered judgment for the petitioner.[9] The Circuit Court of Appeals in turn reversed and reinstated the judgment of the insular district court.[10] We granted certiorari, as the case presents an important question arising under the Insular Organic Act. We hold that the judgment of the Circuit Court of Appeals was right.

By the Act of 1908,[11] the people of Puerto Rico undertook the construction of a public irrigation system. This necessitated the erection of a dam for impounding and storage of part of the waters of the Jacaguas River above the respondent's intakes, and the creation of an irrigation district. The statute recognized the necessity of providing a method for the acquisition of the rights of riparian owners whose land lay below the dam. Section 12 authorized the condemnation of existing water rights and the payment of their fair value to the owners. By the amendatory Act of 1913, the owners of lands which fell within the irrigation district could release their preëxisting rights, have them valued, and be paid the value by credits against

[7] 60 F. 2d 10.
[8] *Puerto Rico* v. *Russell & Co.*, 288 U. S. 476.
[9] 56 P. R. Dec. 343.
[10] 118 F. 2d 225.
[11] *Supra,* Note 2.

their proportionate share of the expense of the construction and operation of the system.[12]   By § 13, owners of lands having water rights, whose source of supply would be destroyed or impaired by the construction or operation of the system, who had not surrendered or relinquished their rights, were declared entitled to receive from the irrigation system an amount of water which would be the reasonable equivalent in value of the right or concession so destroyed or impaired.   The Commissioner was authorized to negotiate contracts to this end with such owners.

It is evident that it was thought that lands such as those of the respondent could not be included within the proposed district.   It is idle to speculate concerning the reasons for this decision, though it is clear that in order to realize the Government's purpose it was deemed necessary to reach an accommodation concerning preëxisting valid water rights of land owners whose lands could not or should not be included in the irrigation district.   In the case of such persons the purpose was to substitute a fair equivalent for the rights theretofore exercised.   Such an arrangement offered mutual advantages to Puerto Rico and to the owners.   Whereas Fortuna had, prior to the erection of the dam, the right to take over 12,000 acre-feet of water per year for irrigation, a proportion of surplus waters, and certain torrential waters, the supply was uneven and uncertain due to the irregularity of rainfall.   It was, therefore, an advantage to the respondent's predecessor to surrender its maximum rights in consideration of an agreement that there should be delivered to it, equally and evenly throughout the year, something less than the maximum it was entitled to take under preëxisting conditions.   On the other hand, it was an advantage to the irrigation system that it should not be obliged at any time to deplete its storage waters by furnishing the respondent

[12] *Supra,* Note 3.

616

the maximum amount which, if the water were available, it was entitled to receive.

The Insular Supreme Court held that the exaction is not precluded by the contracts, and works no impairment of their obligation. It held the exaction is a tax; that the rights which the respondent owned prior to the construction of the irrigation system were taxable, and that the privileges it enjoys under the contract are equally so; that the contract contains no covenant not to tax these rights or privileges and, if it did, it would be beyond the power of the Commissioner. We cannot agree.

The assessment contemplated by Act No. 49 of 1921 is not a general tax laid for the support of government upon a property right or a franchise. This is expressly admitted by the petitioner in brief and in oral argument. In the brief it is said: "The special taxes or assessments here in question, if and when collected, will simply accrue to the special fund for the current operation and maintenance of the irrigation district, and thus serve only to lower the assessments upon other lands now taxed for such operation and maintenance. The insular Treasury can derive no direct benefit." And, in oral argument, counsel for petitioner frankly conceded that the money to be raised is not taxes in any way but merely an assessment against the respondent's land for the cost of delivering the water. If Puerto Rico had essayed to tax respondent's lands or its water rights by a general law, quite distinct questions would arise which we need not discuss.

Treated as an assessment of part of the cost of maintenance of the irrigation system, the petitioner insists that the exaction does not violate the obligation of the 1914 contracts. It asserts that the agreements were only that a given amount of water would be released, or made available, or allotted to respondent and therefore The

People of Puerto Rico are free to charge to respondent the cost of delivering the water; and, further, that if the contracts, by their terms, precluded the imposition upon the respondent of this cost they are beyond the power of the Commissioner.

Section 13 of the Act of 1913 authorizes the Commissioner "to enter into agreements with such owner or owners as to the amount of water and the time, place and conditions of *delivery* thereof, which *shall be delivered to the lands* to which the said water rights or concessions are appurtenant as the fair equivalent in value thereof, . . ." We think it evident from this language that the Commissioner was not limited to agreeing to allot to the land-owner a certain amount of water, but was empowered to stipulate that at certain times he would cause to be delivered, at specified places, the water which respondent was to receive as the equivalent of that which it had formerly been entitled to take at its intakes along the river. That the Commissioner so construed his authority is plain from the terms of the contracts.

Each contract describes the rights appurtenant to the lands in question, acknowledges their validity, states the amounts of water the respondent's predecessor is entitled to take, and, in consideration of the mutual covenants of the parties, stipulates "that the quantities of water specified" in the agreement, "delivered uniformly through the year, subject to the terms and conditions specified in this agreement, . . . are the fair equivalent in value of the water which the said Fortuna Estates takes under and pursuant to the concessions and water rights claimed by it, and The People of Porto Rico will, subject to the conditions and limitations hereinafter specified and at the times, places and subject to the conditions of delivery hereinafter provided for, *make delivery*" of the amounts of water specified in the agreement. Each contract further provides that "The People of

Porto Rico will deliver the said water as follows." One agreement covenants that the water deliverable for some of the tracts shall be at the intakes provided by the owner, and that water deliverable to another tract shall in part be deliverable at such an intake and in part at a pumping station on the bank of the river. The right is reserved, upon notice by The People of Porto Rico, to change the place of delivery of certain of the water. It is further provided that if delivery at the points designated is temporarily interrupted, Porto Rico will deliver an equivalent amount of water at some other point. It is agreed that the presence of water in the river bed at the opening of the described intakes, sufficient to permit the owner to take the quantities specified in the agreement, shall be deemed a delivery within the meaning of the contract. A clause provides that should the owner desire to take water for certain of the tracts at places other than the present intakes, Porto Rico will deliver the water at such other places but that "all extra expenses occasioned by such delivery shall be borne by" the owner.

The obligation of Porto Rico to deliver the named quantities is recognized in many clauses of the contracts. As applied to the petitioner, the word "deliver" appears ten times in each contract, the word "delivery" nine times, and the word "deliverable" four times, in one of the documents. From the four corners of the agreements it is clear that, in consideration of the suspension of the rights of Fortuna, and its successor, the respondent, the insular government agreed not merely to allot, but to deliver, at specified places, certain quantities of water. Prior to the execution of the contracts, Fortuna was under no obligation to the government to pay it any cost or expense for the bringing of the water to its intakes. The contract clearly contemplates that it is to be under none with respect to the water agreed to be

delivered to it in lieu of that which it formerly had the right to take. This fact is emphasized by the provision that, if it desires delivery at other places than those specified in the contracts, it shall bear the expense entailed by the change.

The deficit in the maintenance cost of the system was met, for some time, by the sale of surplus water. The contract gives the respondent the right to a portion of such surplus water over and above the specified amounts to be delivered by the petitioner. The respondent sued to enjoin the petitioner from selling the surplus water to which it claimed to be entitled. The suit resulted in an injunction. The Government being thus deprived of the revenue theretofore used towards the maintenance of the system, adopted the Act of 1921 with the evident purpose of recouping a portion of that expense from the respondent and others with whom it had made contracts in 1914 for the delivery of the stipulated amount of water to them without charge therefor. The history of the legislation shows that the proposed exaction was not a general tax but was an effort to collect from persons whose land was not in the irrigation system a portion of the expense of maintaining that system, whereas the contracts exempted them from contributing to such cost as a condition of receiving the stipulated amount of water from the system. This was a clear violation of the obligation of the contracts.

The judgment is

*Affirmed.*

Mr. Justice Douglas, dissenting:

There was no provision whatsoever in the grant of these water rights exempting them from any form of taxation. Hence if no contract had been made and the irrigation system had been constructed and respondent's lands had been serviced in precisely the same way as

was done here, I should think that there would be no doubt but that the assessment would be valid. The Supreme Court of Puerto Rico relied for the validity of the assessment on such cases as *Knowles* v. *New Sweden Irrigation District,* 16 Ida. 217, 235, 101 P. 81, 87, and *Bleakley* v. *Priest Rapids Irrigation Dist.,* 168 Wash. 267, 11 P. 2d 597. Those cases hold that, under certain circumstances, the owner of a water right may be brought into an irrigation district and forced to pay an assessment. As stated in the *Knowles* case (p. 241):

"Under our irrigation law as it existed at the time of the organization of this district and the assessments referred to were made, if the land of the plaintiff was properly included in said irrigation district, it was subject to assessment for benefits, provided it received any, whether the owner of said land owned a water right in connection therewith or not; for a person in an irrigation district may receive certain benefits regardless of whether the owner has a water right in connection therewith or not."

The reasons which permit the owner of a water right to be brought into an irrigation district are equally cogent here. For, the impact of this assessment is not more rigorous than the assessment attendant on membership in an irrigation district. In fact, it is less, since respondent is being assessed only for a prorata share of the cost of maintenance and operation of the system, not its construction.

It was clear and undisputed that respondent obtained substantial benefits from the irrigation system. (1) The quantity of water received by respondent from the system is 19% larger than what previously had been available from the earlier limited flow of the river. (2) The storage reservoir impounds flood waters which would be largely lost to respondent. The dam not only increases the amount of water available but makes possible regu-

lar and more continuous deliveries of the water. (3) The irrigation system has tapped new sources of water which feed the reservoir. No separation of that additional supply of water from the old supply is possible. As a result, respondent obtains additional advantages, especially in dry years. (4) By reason of the construction and operation of the irrigation system, the water is available at several different distribution points through canals rather than at the river bed alone.

In that posture of the case, we would be faced with a determination by the legislature of Puerto Rico that respondent's lands were benefited and that respondent should pay an assessment. It has long been held that such a "determination is conclusive upon the owners and the courts." *Spencer* v. *Merchant*, 125 U. S. 345, 356. And see *Davidson* v. *New Orleans*, 96 U. S. 97; *Walston* v. *Nevin*, 128 U. S. 578. As stated in *Fallbrook Irrigation District* v. *Bradley*, 164 U. S. 112, 176, 177, "the fact of the amount of benefits is not susceptible of that accurate determination which appertains to a demonstration in geometry"; the choice of methods employed "is one of those matters of detail in arriving at the proper and fair amount and proportion of the tax that is to be levied on the land with regard to the benefits it has received, which is open to the discretion of the state legislature, and with which this court ought to have nothing to do." And see *French* v. *Barber Asphalt Paving Co.*, 181 U. S. 324; *Milheim* v. *Moffat Tunnel Improvement Dist.*, 262 U. S. 710, 721; *Roberts* v. *Richland Irrigation Dist.*, 289 U. S. 71; *Chesebro* v. *Los Angeles County Flood Control Dist.*, 306 U. S. 459.

The existence of the contracts does not call for a different result. The statute in question provided that owners of water rights, such as respondent, "shall be entitled to receive from the irrigation system an amount of

water which is the reasonable equivalent in value of the said water right or concession." The Commissioner of the Interior was authorized "to enter into agreements with such owner or owners as to the amount of water and the time, place and conditions of delivery thereof, which shall be delivered to the lands to which the said water rights or concessions are appurtenant as the fair equivalent in value thereof." Act No. 128, § 13, August 8, 1913, L. 1914, pp. 54–84. The contracts, as well as the statute, speak of "delivery" of the water. But the Supreme Court of Puerto Rico interpreted the contracts as meaning that respondent "agreed to *receive* [italics supplied] from the irrigation system a certain quantity of water in exchange" for its water rights. I do not think that that construction is unwarranted.

(1) The contracts themselves make plain that, as respects certain intakes on the river, "the presence of water in the river bed . . . in quantities sufficient to permit the taking at the said intakes of the amounts of water specified shall be deemed to be deliveries." That provision alone demonstrates that the Supreme Court of Puerto Rico was justified in interpreting "delivery" in these contracts differently than might be warranted in case of contracts for the cartage of goods. "The word 'deliver' has perhaps as many different shades of meaning ascertained by judicial interpretation as any other term known to the law." *United States* v. *McCready,* 11 F. 225, 234. The problems of operation of an irrigation system are unique in many respects. Manipulation of the gates at the dam determines the flow of water through the various channels. Puerto Rico's undertaking in each instance was to "deliver" water at specified intakes provided by respondent. Those intakes were in the river or in designated reservoirs provided by respondent. It seems reasonable to conclude that Puerto Rico's

undertaking was to make the specified quantities of water available so that they would be received at those intakes. To enforce the present tax is not to renig on that undertaking. The fact that respondent was to bear "all extra expenses" in case water was delivered at intakes other than the designated ones seems to me hardly more than a provision that respondent was to bear the cost in case the irrigation system had to be partially relocated to meet its requirements. In any event, it does no more than raise a doubt as to the correct interpretation of the contract—a doubt which, as subsequently pointed out, should not be resolved against the power of Puerto Rico to impose this tax.

(2) It seems to me tolerably clear that such a construction of the contracts comports with the purpose of the arrangement. The contracts state that Puerto Rico, "in order to facilitate and make more certain the operation of the said dam and the irrigation system of which it is a part, desires to determine and agree upon an amount of water which, delivered regularly, may, under all attending circumstances, be considered to be fair equivalent in value for irrigation purposes of the amount of water which the Fortuna Estates would under ordinary circumstances take and use under the said water rights and concessions." The amount of water actually obtained by respondent before the dam was erected apparently fell far below the amount to which it was entitled under their water rights. The contracts were designed to substitute for that latter theoretical figure one which would represent a "fair equivalent in value for irrigation purposes" of the amount of water which respondent would "under ordinary circumstances take and use" under its water rights. From Puerto Rico's point of view, such a determination was important so that the demands on the dam could be reduced to known requirements and so that the erection of the dam would not

result in a windfall to respondent. The latter certainly would transpire if the dam gave respondent an amount of water which it had not been able to obtain on its own without the irrigation system. Thus the specification in the contracts of the "fair equivalent" of the amount of water which respondent ordinarily would obtain under its water rights was nothing more than a determination of the then worth of the water rights in terms of acre feet of water. Under that view, the contracts did not raise the water rights to a higher constitutional dignity than they previously enjoyed.

(3) No express exemption from this form of taxation is to be found in the contracts. If that exemption exists, it is implied. But even though it be assumed *arguendo* that Puerto Rico's representative had the authority constitutionally to bargain away its taxing power, the exemption should not be inferred. Chief Justice Marshall stated in *Providence Bank* v. *Billings*, 4 Pet. 514, 561, that a relinquishment of a power to tax "is never to be presumed"; "its abandonment ought not to be presumed, in a case in which the deliberate purpose of the state to abandon it does not appear." If there are doubts, they must be resolved in favor of the government. *Wells* v. *Savannah*, 181 U. S. 531; *Chicago Theological Seminary* v. *Illinois*, 188 U. S. 662; *Metropolitan Street Ry. Co.* v. *New York*, 199 U. S. 1, 35–36. As stated in *Wells* v. *Savannah, supra*, pp. 539–540, a contract of exemption from taxation must "be clearly proved. It will not be inferred from facts which do not lead irresistibly and necessarily to the existence of the contract. The facts proved must show either a contract expressed in terms, or else it must be implied from facts which leave no room for doubt that such was the intention of the parties and that a valid consideration existed for the contract. If there be any doubt on these matters, the contract has not been proven and the exemption does not exist."

That rule should be applied to this situation. It is clear that respondent is one of the beneficiaries of the irrigation system, even though the additional amount of water which the erection of the dam enabled it to obtain be disregarded. The meaning of the word "delivery" as used in the contracts is at best ambiguous. Hence, we should strictly adhere to the presumption against exemption from taxation. To resolve all ambiguities in the contracts in respondent's favor and against Puerto Rico is to forsake a canon of construction which has long obtained.

In conclusion, Puerto Rico has not treated respondent the same as landowners who have no water rights. The latter have to pay for the construction of the irrigation system as well as for its maintenance and operation. Respondent, on the other hand, is merely required to contribute towards the cost of maintenance and operation of the system. On these facts, that favored treatment is sufficient respect for the integrity of respondent's property rights. To free it from all burden is to give it a windfall. Only under the compulsion of plain and unambiguous language should we permit a beneficiary of such a project to escape his fair share of the costs. There is no such compulsion here. Hence we should refuse to let the contract clause of Puerto Rico's organic law produce an inequitable, unfair, and harsh result.

MR. JUSTICE BLACK, MR. JUSTICE MURPHY, and MR. JUSTICE BYRNES join in this dissent.