In the Matter of the Application of RENO PRESS BRICK COMPANY, a Corporation, to Exclude Lands from WASHOE COUNTY WATER CONSERVATION DISTRICT.

WASHOE COUNTY WATER CONSERVATION DISTRICT, an Irrigation District, Appellant, *v.* RENO PRESS BRICK COMPANY, a Corporation, Respondent.

No. 3194

November 5, 1937.                    73 P. (2d) 503.

*Price & Merrill,* for Appellant.

*George Springmeyer, Sallie R. Springmeyer* and *Bruce R. Thompson*, for Respondent:

## OPINION

By the Court, TABER, J.:

Respondent corporation is the owner of 33 acres of land included within the boundaries of appellant irrigation district. Acting under the provisions of section 44

of the irrigation district act (section 8059 N. C. L. 1929), as amended, Statutes of Nevada 1933, pp. 278, 279, c. 186, sec. 8, respondent, on April 30, 1936, applied in writing to appellant's board of directors for the exclusion from the district of said piece of land. After considering the application, the board of directors of the irrigation district, on July 9, 1936, rejected respondent's application in whole. Thereafter, respondent petitioned the district court to set aside said order of appellant's board of directors, and to direct that said land be excluded from the district. The matter was later tried, and, in December 1936, the district court granted respondent's application, and adjudged that said land be excluded from the irrigation district. This appeal is taken from said judgment, and from an order of said district court denying a motion for a new trial.

The portion of said section 44 of the irrigation district act with which we are primarily concerned, reads as follows: "The board of directors of any district now or hereafter formed under the provisions of this act, either upon its own initiative or upon the application in writing of any holder of title or of evidence of title to land in the district, may, by a majority vote, exclude from the district any land or lands theretofore included in the district, and change the boundary lines of the district so as to exclude or leave out certain tracts or portions of tracts when the proposed system or systems of irrigation cannot practically include such land or lands, or when such land or lands would not be benefited by the district or by any improvement it might make." Respondent's application for exclusion of its land was and is based upon the contention that said land would not be benefited by certain improvements contemplated by the district.

The tract of land sought to be excluded from the irrigation district adjoins the city of Reno on the north. No part of it is within the city limits, but its southern boundary line is identical along its whole length with a

portion of the northern boundary line of the city of Reno. The land has been irrigated for the past twenty or twenty-one years. For the first five or six years, two crops of alfalfa were grown upon it annually. After that, it was allowed to go to pasture. With an ample supply of water, it will produce good pasturage crops.

This land was deeded, on April 30, 1932, to J. L. Raffetto and wife to Parker Brick Company. The deed contained the following provisions relating to water, reservoir, and ditch rights: "Together also with six miner's inches of water for the use of the party of the second part, said water to be taken out of the reservoir hereinafter referred to, the party of the second part to pay its proportion of all necessary expense incurred in maintaining the said reservoir and the irrigating ditch leading thereto, as well also, its proportion of the charges and expense incurred in the delivery of the water flowing and to flow in said ditch to said reservoir from the Highland Ditch, but the parties of the first part are in nowise to be held responsible to the party of the second part for the delivery of said six inches of water, or any part thereof, should there at any time be a shortage of water in said reservoir. Excepting and reserving from said parcel of land that portion thereof used by the parties of the first part for reservoir purposes and containing approximately two acres of land." "The parties of the first part herein reserve the right of way along the north line fence of the property herein conveyed for the perpetual maintenance of a ditch of sufficient width and depth to carry fifty inches of water, with sufficient ground on both sides of said ditch to enable the parties of the first part to properly clean and and care for said ditch."

The name of Parker Brick Company was later changed to the Nevada Brick & Tile Company, Inc. On March 25, 1935, the Nevada Brick & Tile Company, Inc., deeded the land involved in this case to respondent. This conveyance contained the following paragraph: "Together

with all the appurtenances thereunto belonging or in anywise appertaining, including all water rights consisting of six (6) miner inches of water only and ditch rights belonging to or used in connection with the irrigation or cultivation of said land, so far as applicable only to the said six (6) miner inches of water, and together with the buildings thereon and all machinery affixed to said premises; it being understood that the party of the second part will share in the expense of maintaining all ditch and ditch rights so far as applicable to said six (6) miner inches of water."

During the three or four years that Parker Brick Company owned this property, it was used for the manufacture of brick, and to that extent the statement heretofore made, that this land has been irrigated for some twenty-one years, must be qualified. The buildings and machinery which had been used by Parker Brick Company in the manufacture of brick on said premises were of small value at the time the property was purchased by respondent. The premises have not been used for brick making at any time since respondent has owned them.

Mr. J. L. Raffetto paid respondent $75 for the use of the land in 1935; the premises being used by Mr. Raffetto for pasturage and the water for its irrigation supplied by him. In 1936, respondent allowed Davey Gardella, a neighboring farmer, to use the land for pasturage, without paying any rent therefor. Mr. Gardella also furnished the water for irrigation, as respondent's water right, as we have seen, is limited to six miner's inches.

Washoe County Water Conservation District was organized in June 1929. Its manager, Thomas R. King, testified, as follows, in the district court:

"Q. Are you familiar with the planning of the District for the conservation of water and its application to lands in the District? A. Yes, I am.

"Q. State briefly what those plans are? A. The plans

propose to settle by compromise instead of litigation the differences in opinion as to water rights belonging to the various water users of the Truckee River and also to construct the reservoir on the Little Truckee River which will impound flood waters and other waters, and release these waters for the benefit of members of the Irrigation District and of the Power Company, and of the Truckee Canal Irrigation District at times when the natural flow of the water of the Truckee River is insufficient to provide an adequate amount of irrigation water and to charge the members of the District for the water supplied them through this construction in proportion to the benefits the various parcels of land will receive.

"Q. Has that plan progressed so far that an agreement has been entered into with the Government of the United States for the carrying out of the plan? A. No, the agreement has not been entered into. However, an agreement has been drawn which has been approved by the United States, the Conservation District and the Truckee Canal Irrigation District and the Sierra Pacific Power Company, and as I understand, a requisite number of owners, as individuals within the boundaries of the Irrigation District, and in other words, it is now ready for execution.

"Q. Does the plan contemplate the furnishing of water to anyone except those who are within the District and contribute toward the cost of the upstream storage? A. It does not—and further the Nevada Statutes and the Irrigation District Act would prevent any such granting of water or benefits."

Without water the land in controversy would be valueless for agricultural purposes. With an adequate water right it would be worth from $125 to $150 per acre for agricultural purposes. With the exception of about three and one-half acres, the land is susceptible of irrigation by gravity. Mr. Raffetto offered respondent $100 for the use of the property in 1936, he to furnish the water; and Mr. Ernest Capurro, a farmer who

has been familiar with this property for many years, told the president of respondent corporation that he thought the use of the land was worth $100 or $110 per year.

It is estimated that this property would be worth about $400 an acre if subdivided for residential purposes. The amount paid by respondent when it purchased the property (including the old plant) was $15,000. The testimony of William I. Smyth, associate professor of metallurgy in the Mackay School of Mines and chemist of the State Analogical Laboratory, based on samples taken from various places on the premises, shows clearly that the clay content makes this property suitable for brick making. Mr. Albert J. Caton, president of respondent company, values the land for brickmaking purposes at $500 an acre. He testified that when this property was offered for sale to respondent company, it was checked over for the purpose of using the ground for its clay content, "or any other use it might be put to." "We acquired the ground for the purpose of making brick, but not the plant. The plant was practically worthless at that time and had not great monetary value. Some of the machinery has a small value, not a great value." Respondent company is engaged in the business of manufacturing clay products and retailing fuel oil. It is not, and never was, engaged in irrigation or farming; nor does its charter authorize it to engage in such pursuits.

Respondent purchased the six miner's inches water right for the purpose of use in the manufacture of brick. The reservoir is situated in the lowest part of the land, and can be made use of by respondent only by means of pumping. For adequate irrigation, respondent's said 33-acre tract would require a water right of about 20 miner's inches.

The tract of land sought to be excluded from the district is but one of a considerable number owned by respondent. It has from time to time purchased other

pieces of land, suitable for the manufacture of clay products, in various locations within a few miles of Reno. The last two of such purchases made prior to the time of the trial were smaller tracts, for which $900 an acre was paid. The supply of material at the location where respondent company is now engaged in manufacturing clay products will last probably from 10 to 12 years. It is a higher quality of material than that contained in said 33-acre tract, which is suitable only for making common brick. When asked whether respondent company intended to make any use of the 33-acre tract within the next 10 or 12 years, Mr. Caton testified: "We probably will have to use some of the clay as it is required. We may even use it before then."

The only present source of water with which to irrigate respondent's 33-acre tract is what is known as the Highland ditch, which is approximately 3,000 feet from said land. A right of way for a lateral ditch would have to be purchased through at least one farm, and the ditch would have to be run under two public highways. The Highway Department requires a concrete abutment at each end of an underpass. Mr. C. V. Taylor, a qualified engineer of 36 years' experience, testified, in part, as follows:

"Q. Considering all the expenses, not counting the cost of the right of way, but including the pipes and abutments under the streets, what do you say the minimum expenses would be? A. I believe it would cost close to $800.00.

"Q. Do you know anything about the value of rights of way in that vicinity, such as would be required for this ditch? A. In other places as near to the town, or anywhere near the town that is on the main highways it would be at least $300.00 an acre, maybe $400.00 or $500.00. It is whatever they ask. I don't know."

Mr. Caton testified, with reference to the cost of constructing a lateral ditch and bulkheads, that he doubted whether, leaving out of consideration the right of way

which would have to be obtained, the ditch could be built and put under both highways for less than $1,500. In addition to the foregoing, the carrying charge in the Highland ditch, which would have to be paid by respondent company, is approximately $7.50 per miner's inch annually.

Mr. Raffetto testified that for $150 he would be willing to give respondent the right to carry water through his ditch, provided respondent would pay its share of maintaining and cleaning the ditch and any division boxes that might be necessary. He further testified that an ample supply of water for respondent's 33-acre tract could be obtained through his ditch from the Highland ditch. With reference to this offer, Mr. Raffetto further testified on cross-examination, as follows:

"Q. I understood you to say $150.00 was to be a yearly payment to you for a half interest in your ditch? A. No, that would be a protection right in the ditch.

"Q. Do you mean to say you would sell the use of a half interest in that ditch for $150.00? A. Yes.

"Q. And you only know it would take about a week's work and a team of horses to dig the ditch in Mr. Herman's place? A. I spoke of three men.

"Q. And based upon that you would sell a half interest in your ditch for $150.00. A. I would not sell it, but I would give him the right of way there.

"Q. How long is this offer of $150.00 good? A. It may carry for a good long time.

"Q. You are very much interested in having this ground included within the district, are you not? * * * A. Yes, I would like to see it irrigated. The reason may be that the land has always been used for pasturage purposes and I don't think it has any value whatever so far as city property is concerned, only five or six hundred feet, probably extending back three hundred feet could be used for city property. The rest of it is useless so far as city property is concerned.

"Q. You also would like to see it irrigated to get

waste water into your land, would you not? A. Yes, I was going to add that.

"Q. And you have a selfish purpose in that, have you not? A. Yes."

Mr. Raffetto testified that he thought a lateral ditch from the Highland ditch to respondent's 33-acre tract, including concrete abutments at the ends of the underpasses beneath the two public highways, could be constructed for less than $1,500, and that he would like to have the job for that amount. He admitted, however, that he did not know how much the abutments would cost, and could not state for how much less than $1,500 he would be willing to do the work.

In February 1935 the legislature passed an act authorizing and empowering the board of county commissioners of Washoe County to bond said county in the amount of $500,000 to aid in the construction of the works and improvements for upstream storage of waters of the Truckee river system, hereinbefore mentioned. For the purpose of creating a fund for the payment and redemption of said bonds, the county commissioners were directed by said act to levy and collect an annual ad valorem tax on all taxable property within Washoe County. Statutes of Nevada 1935, chap. 17, pp. 22–24.

In his testimony, on cross-examination, Mr. Caton gave it as his opinion that the upstream storage project would be a great benefit; that presumably greater crops would result in better conditions to Reno; that if the crops would not cost too much to produce, farmers would undoubtedly have more money to pay the merchants for supplies; that taking it all together, the result of the upstream storage and the adequate supply of water for the ranchers would no doubt make conditions better generally throughout the district and the community; that he himself had worked in favor of the upstream storage and was still ready to work for it; that if conditions should be improved as expected, the value of the majority of lands in the vicinity of the city

of Reno would increase, though he could not say that the value of all such lands would be increased, but that if the cost of upstream storage becomes prohibitive from the stock raising end, the project will be detrimental to the community.

■ There is no substantial conflict in the testimony in this case. The question we have to determine is the interpretation to be put on the word "benefited" as applied to the undisputed facts disclosed by the testimony. Upon respondent rests the burden of proving by a fair preponderance of evidence that the Truckee river upstream storage project will not benefit its 33-acre tract of land.

Appellant contends that this court should follow the decisions of courts of other states in holding that the benefit to the land, as contemplated by said amended section 44 of the irrigation district act, may be indirect as well as direct. Appellant further contends, however, that the evidence in this case shows that respondent's said land will be directly benefited by the upstream storage project. The authorities chiefly relied upon by appellant are the following: Board of Directors of Modesto Irrigation District v. Tregea, 88 Cal. 334, 26 P. 237; Los Angeles County Flood Control District v. Hamilton, 177 Cal. 119, 169 P. 1028; Oregon Short Line R. Co. v. Pioneer Irrigation Dist., 16 Idaho 578, 102 P. 904; Otis Orchards Co. v. Otis Orchards Irr. Dist. No. 1 et al., 124 Wash. 510, 215 P. 23; Bleakley v. Priest Rapids Irr. Dist., 168 Wash. 267, 11 P.(2d) 597; Texas & P. Ry. Co. v. Ward County Irr. Dist. No. 1, 112 Tex. 593, 251 S. W. 212; Western Union Tel. Co. v. Wichita County W. I. Dist. No. 1 (Tex. Civ. App.) 19 S. W.(2d) 186; Miller & Lux, Inc. v. Sacramento & San Joaquin Drainage District, 256 U. S. 129, 41 S. Ct. 404, 65 L. Ed. 859; McLean v. Truckee-Carson Irr. Dist., 49 Nev. 278, 245 P. 285.

Respondent takes the position that, in Nevada, land within an irrigation district should be excluded therefrom on application of the owner when such land will not

be directly benefited by the district or by any improvement it might make. In the instant case, respondent insists that the Truckee river upstream storage project will not directly benefit respondent's said 33-acre tract of land, or any part or portion thereof. Respondent calls attention to section 1, and sections 3 and 44 of the irrigation district act, as amended (N. C. L. 1929, sec. 8008; section 8010 [as amended by Stats. 1931, c. 163]; section 8059 [as amended by Stats. 1933, c. 186, sec. 8]), but places its main reliance upon the case of Springmeyer v. Irrigation District, 50 Nev. 80, 251 P. 351.

We have carefully considered all the authorities cited by respective counsel, and, in addition thereto, have examined the following cases: Harelson v. South San Joaquin Irr. Dist., 20 Cal. App. 324, 128 P. 1010; J. & W. C. Shull v. Merced Irr. Dist., 90 Cal. App. 270, 265 P. 965; Hand et al. v. El Dorado Irr. Dist., 97 Cal. App. 740, 276 P. 137; Rathfon v. Payette-Oregon Slope Irr. Dist., 76 Or. 606, 149 P. 1044; Hamilton v. Rudeen, 112 Or. 268, 224 P. 92; In re Central Pac. Ry. Co., 144 Or. 527, 25 P.(2d) 927; Northern Pac. Ry. Co. v. Walla Walla County, 116 Wash. 684, 200 P. 585; In re Extension of Boundaries of Crow Creek Irr. Dist., 63 Mont. 293, 207 P. 121; Knowles v. New Sweden Irr. Dist., 16 Idaho 217, 101 P. 81; Id., 16 Idaho 235, 101 P. 87.

█ █ We find it unnecessary to decide whether, in Nevada, an indirect benefit to land, within the meaning of amended section 44 of the irrigation district act, may be sufficient to justify a refusal to exclude such land from an irrigation district, because the uncontradicted evidence satisfies us that respondent has not met the burden imposed upon it by the statute to show that its said land will not be directly benefited by the Truckee river upstream storage project. We shall proceed to set forth some of the reasons which have influenced us in reaching this conclusion.

The land is not now being used for the manufacture of clay products, and will probably not be so used for

at least ten or twelve years, because the supply of superior clay where respondent company is now manufacturing its products will, it is estimated, last that long, and respondent has other clay deposits superior in quality to that in its said 33-acre tract.

It will not be necessary for respondent to go to any considerable expense in irrigating this land, because a neighboring farmer has offered to allow respondent to carry water through his ditch for a very small consideration. Respondent claims that this offer is indefinite and uncertain, and one that could not be relied on in the event of disputes arising; further, that the offer may be revoked at any time. We think, however, that Mr. Raffetto's offer is sufficiently definite and certain to insure respondent's having an inexpensive right of way to carry water from the Highland ditch to its land; and the likelihood of the offer's being revoked does not appear to be imminent, because Mr. Raffetto hopes to receive waste water from respondent's tract. If, in order to take advantage of Mr. Raffetto's offer, respondent would be required to go to large expense, a different question would be presented; but respondent's greatest expense, aside from paying Mr. Raffetto for a right of way through his ditch, will be the $7.50 to be paid the district annually for the use of each miner's inch of water from the Highland ditch.

No testimony has been offered showing or tending to show that the clay content of respondent's said 33-acre tract will be in any way injured or damaged by irrigation.

The undisputed testimony shows not only that this land is susceptible of irrigation, but that it has actually been irrigated for the greater part of the last 20 or 21 years.

If the land were not susceptible of any use for agriculture, as was alleged to be the case in Northern Pac. Ry. Co. v. Walla Walla County, 116 Wash. 684, 200 P. 585; if, as appeared in the case of In re Central Pac.

Ry. Co., 144 Or. 527, 25 P. (2d) 927, irrigation would constitute a detriment to the clay content of the land; or if the land were now being used for the manufacture of clay products, or definite plans were now being made to use it for that purpose within a reasonably short time, we might well have decided to affirm the judgment of the district court.

It does not result from the refusal to allow respondent's 33-acre tract to be excluded from the district that respondent must irrigate the land. It need not exercise that right unless it so chooses, and, so far as the court can see, respondent may rent or otherwise dispose of it.

The fact that this land is more valuable to respondent company for brickmaking purposes than for any other purpose, does not alter the fact that it is valuable for agricultural purposes, and that it will be directly benefited for agricultural purposes by the upstream storage project.

The court is of opinion that it would not be justified in holding that the tract of land in controversy should be excluded from the district simply because respondent's charter does not authorize it to engage in irrigation or agricultural pursuits.

■ The court is not to be understood as holding that respondent may not at some future time be entitled to have this land excluded from the district; but viewing the situation, as we must, as it existed at the time of the filing of respondent's application and at the time of the trial in the district court, it is the court's opinion that, under the law, respondent is not entitled at this time to have said tract excluded from appellant conservation district. We find nothing in the law which would prevent respondent's filing another application for exclusion of this land from the district at a time when conditions may be different from those shown by the evidence to exist in this case.

The judgment and order appealed from are reversed.